**AMERICAN LIBRARY ASSOCIATION, et al., Plaintiffs,**

v.

**Dick THORNBURGH, Attorney General of the United States, et al., Defendants.**

Civ. A. No. 89–0661.

United States District Court, District of Columbia.

May 16, 1989.

---

*judge whether others, such as engines, fittings,* bulkheads, ladders and cabins (to name a few), fit into that category.

Bruce J. Ennis, David W. Ogden, Mark D. Schneider and Ann M. Kappler, Jenner & Block, Washington, D.C., Victor Kovner and Richard D. Emery, Lankenau, Kovner & Bickford, Michael D. Reamer, Shank, Davis & Reamer, and Steven M. Bierman, Sidley & Austin, New York City, for plaintiffs.

David J. Anderson, Vincent M. Garvey and Richard C. Stearns, Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

Nancy L. Buc, Weil, Gotshal & Manges, Washington, D.C., for amicus curiae Ass'n of American Publishers.

Benjamin W. Bull, Phoenix, Ariz., for amicus curiae Citizens for Decency Through Law, Inc.

Charles B. Ruttenburg, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., for amicus curiae Video Software Dealers Ass'n.

Robert T. Page, Denver, Colo., for amicus curiae American Sunbathing Ass'n.

## OPINION AND ORDER

REVERCOMB, District Judge.

The plaintiffs, which represent producers and distributors of books, magazines, films, and other material generally protected by the First Amendment, brought this suit requesting the Court to declare unconstitutional and enjoin enforcement of provisions of the Child Protection and Obscenity Enforcement Act, enacted in late 1988. The defendants are officials and agencies of the United States government empowered to enforce the act. Oral argument was heard on April 25, 1989, on the plaintiffs' motion for a preliminary injunction and on cross-motions for summary judgment. In this opinion and order, the Court grants in part the plaintiffs' motions for a preliminary injunction and for summary judgment. The Court declares unconstitutional and enjoins enforcement of the record-keeping and criminal presumption provisions, and declares unconstitutional certain aspects of the forfeiture provisions.

### I. Introduction

There are few stronger contrasts in the law than the differences in the legal treatment of nude images. If the model in an image is at least 18 years old, the producers and distributors are protected by the full range of rights under the First Amendment, unless the image falls into the narrow category of "obscenity."[1] By contrast, if the model has *not* reached the age of eighteen, producers and distributors of the image are subject to criminal punishment. With child pornography, this legal contrast is heightened by the fact that, to paraphrase the late Mr. Justice Stewart, one cannot always tell it when one sees it.[2]

The distinction in the law exists because of the conflict between two fairly unrelated notions of individual rights. The First Amendment's rights to free speech and free press generally ensure that no citizen will be censured merely because of what he says or puts on paper or film. This right reflects the ideal that no one's expression should be curtailed unless it potentially harms another,[3] and is subject only to narrow exceptions such as slander, libel, and obscenity, the expressions in which extend beyond the speaker and harm others. On

---

**1.** See *Miller v. California,* 413 U.S. 15, 24–25, 93 S.Ct. 2607, 2614–15, 37 L.Ed.2d 419 (1973); footnote 5 of this opinion.

**2.** See *Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring).

**3.** This idea of the liberty of free expression, expressed by the founding fathers in the first amendment, was given its most eloquent exposition by Britain's John Stuart Mill in *On Liberty* (1859).

the other hand, the proscriptions on child pornography are based on the notion that persons under 18 are presumed not to be mature enough to decide whether to participate in pornography; instead, the government wisely decides for them that such participation is unhealthy.[4]

Each side in this case argues that the legal contrast in the treatment of nude images justifies its position. The government argues that precisely because it is often so difficult to determine whether a model is under 18 years old, it is necessary to place requirements on all nude imagery, including ones protected by the First Amendment. The plaintiffs argue that the courts must be extra vigilant in ensuring that efforts to ferret out child pornography are not cast so broadly that they improperly and unnecessarily burden protected material.

It is also worth noting at the outset that this is not a typical pornography case, in which the task is to determine where the line is to be drawn between protected First Amendment material and that which may be prohibited. Here, it is clear that much material that is protected by the First Amendment will be subject to the record-keeping requirements; the question is whether the strong public policy against child pornography justifies the burden on protected material. Finally, this case, unlike many pornography suits, does not involve the questions of local morality or federalism[5]—the law at issue here is a national statute, with equal standards imposed from big cities to rural counties.

Although this Court is sensitive to interfering with the vigorous investigation of and prosecution of child pornography, it concludes that the record-keeping require-ments at issue here excessively burden First Amendment material and infringe too deeply onto First Amendment rights.

## II. The Child Protection and Obscenity Act in General

Since the Supreme Court of the United States ruled conclusively that nudity involving children is *not* protected by the First Amendment, *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), federal prosecution of child pornography under a number of statutes has grown by leaps and bounds. For example, the number of federal indictments for child pornography offenses rose steadily from fewer than 10 in 1983 to more than 200 in 1987. *Testimony of H. Robert Showers, Executive Director of the National Obscenity Enforcement Unit, U.S. Department of Justice, before the House Judiciary Committee* at 6, June 8, 1988. Moreover, a number of recent studies have attested to the harmful psychological effects of pornography on immature participants. *Id.* at 2–4; *Ferber,* 458 U.S. at 756–60, 102 S.Ct. at 3354–56.

Congress on October 21, 1988, approved the Child Protection and Obscenity Enforcement Act,[6] which supporters maintained would improve federal prosecution of child pornography. The 1988 Act, enacted as part of the mammoth Anti–Drug Abuse Act, Pub.L. No. 100–690, 102 Stat. 4487 (1988), added a wide range of weapons to the effort to combat child pornography. Included in the Act were provisions criminalizing "computer porn" (sec. 7511 of the act, codified at 18 U.S.C, §§ 2251–2252), criminalizing the transfer of the custody of a minor for use in the production of por-

---

**4.** *See New York v. Ferber,* 458 U.S. 747, 756–60, 102 S.Ct. 3348, 3354–56, 73 L.Ed.2d 1113 (1982). There is more to the proscription than just parentalism, of course. Many children that engage in pornography are forced into it against their will.

**5.** In the seminal *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), the Supreme Court approved the prohibition of material that is considered to be "obscene" under *local* standards. The rather stringent test for obscenity is that the material must (1) appeal to a "prurient," or unhealthy, interest in sex, to the average person in the community; (2) be "patently offensive" in the relevant community; and (3) lack serious value. *Id.* at 24–25, 93 S.Ct. at 2615. This standard protects many nude images that otherwise might be censurable as "pornographic." The *Miller* decision also is a bow to federalism, in that the local decisions on morality generally are not to be second-guessed by the Supreme Court.

**6.** President Reagan signed the Act into law on November 18, 1988.

nography (sec. 7512, 18 U.S.C. § 2251A), enabling the Racketeer Influenced and Corrupt Organizations (RICO) statute to be used with child pornography violations (sec. 7514, 18 U.S.C. § 1961), criminalizing possession with intent to distribute obscenity that has crossed state lines (sec. 7521, 18 U.S.C. § 1466), making possession of child pornography with intent to distribute on federal property a criminal offense (sec. 7526, 18 U.S.C. § 1460), restricting "dial-a-porn" businesses and criminalizing violations of these restrictions (sec. 7524, 47 U.S.C. § 223(b)), and numerous other provisions.

None of these provisions are challenged here, and each will be added to the arsenal against child pornography, unaffected by this lawsuit. Rather, the only provisions challenged here are (1) the record-keeping requirements (sec. 7513(a) of the act, codified at 18 U.S.C. § 2257), (2) the provision creating criminal presumptions in child pornography suits for failure to complete the records (sec. 7513, 18 U.S.C. § 2257(d)(3), (e)(3)),[7] and (3) sections extending the laws for civil and criminal forfeiture in obscenity and child pornography cases (sec. 7522, 18 U.S.C. §§ 1467, 2253, 2254). The Court deals with each in turn.

### III. The Record–Keeping Requirements
#### A. What Material is Covered

■ The record-keeping section of the Child Protection and Obscenity Enforcement Act requires that

[w]hoever produces any book, magazine, periodical, film, videotape, or other matter which—

(1) contains one or more visual depictions made after February 6, 1978 of actual sexually explicit conduct; and

(2) is produced in whole or in part with materials which have been mailed or shipped in interstate or foreign commerce ... or is intended for [such shipment] ...

shall create and maintain individually identifiable records pertaining to every performer portrayed in such a visual depiction.

18 U.S.C. 2257(a).

The crucial term "sexually explicit conduct" is considerably broader than the dictionary definitions of the words might lead one to believe.[8] The term, taken from existing child pornography law, covers any "lascivious exhibition of the genitals or pubic area of any person," as well as depictions of various methods of sexual intercourse, bestiality, masturbation, and sadism and masochism. *See* 18 U.S.C. § 2257(g) (referring to 18 U.S.C. § 2256). The key term is of course "lascivious," which has been upheld by courts in challenges that it is constitutionally too vague. *See, e.g., Hamling v. United States,* 418 U.S. 87, 112–21, 94 S.Ct. 2887, 2904–10, 41 L.Ed.2d 590 (1974). In addition, courts have held that factors used to determine whether an image is "lascivious" include whether the pose is "sexually suggestive" or "designed to elicit a sexual response in the viewer," among other factors. *See, e.g., United States v. Dost,* 636 F.Supp. 828, 832 (S.D.Cal.1986); *aff'd sub. nom. United States v. Wiegand,* 812 F.2d 1239 (9th Cir.1987). Thus, it is fair to conclude that any frontal nude image of a person in what might be otherwise be called an "erotic" pose is likely to be included as "lascivious."

Accordingly, it is undisputed that the record-keeping requirements are to be imposed on categories of material far broader than the category of "obscenity" as defined in *Miller v. California,* 413 U.S. 15, 24–25, 93 S.Ct. at 2607, 2614–15, 37 L.Ed.2d 419

---

7. The criminal presumptions at issue here are based on and are statutorily part of the record-keeping requirements. 18 U.S.C. § 2257. However, because the record-keeping provisions involve different constitutional issues from the presumptions and because the presumptions may be severable from the record-keeping provisions, the Court analyzes the presumptions as a wholly separate matter.

8. By covering only "actual" sexual conduct, the requirements do not cover "simulated" sexual conduct, presumably as long as it does *not* include any "lascivious" display of the genital area.

(1973). *See, e.g., Erznoznik v. Jackson-ville*, 422 U.S. 205, 208–12, 95 S.Ct. 2268, 2272–74, 45 L.Ed.2d 125 (1975) (sexual material not defined as "obscene" is protected by the First Amendment). It is clear that the record-keeping requirements are to be imposed on material that the Supreme Court has held is protected by the First Amendment.

## B. What They Require

Any producer of a book, magazine, periodical, film, videotape, or other matter that is covered by the section must

(1) ascertain, by examination of an identification document containing such information, the performer's name and date of birth, and require the performer to provide such other indicia of his or her identity as may be prescribed by [Department of Justice] regulations;

(2) ascertain any name, other than the performer's present and correct name, ever used by the performer including maiden name, alias, nickname, stage, or professional name....

18 U.S.C. § 2257(b). The producer must ascertain the information from "every performer portrayed" in a visual depiction covered by the requirements. *Id.* It is unclear to the Court whether bystanders in, for example, a sexual scene in a movie are included in this definition.

The gist of these requirements is that whoever produces or reproduces an image covered by the provision must *personally* contact the model or performer and ascertain that he or she was at least 18 years old when he or she posed or performed. The producer may *not* rely on representations from the photographer or others and may *not* rely on photocopies of identification, such the model's driver's license or birth certificate. The producer must verify the information by personal contact with the model, no matter how long has passed since the photograph or film was first made.[9]

In addition, the producer must get additional information—maiden name, aliases, nicknames, stage or professional names—from each model or performer. Presumably, this information is required to help authorities verify the age of the model and to enable them to track down the use or employment of under-age models by persons other than the photographer or the producer of the image for which the records are compiled.

In addition, the producer must record the information and maintain it at the place of business for inspection by authorities. *Id.* § 2257(b)(3), (c). The records must be kept in accordance with regulations to be prescribed by the Attorney General. *Id.* § 2257(f). The producer must also affix to every copy of the depiction—every book, magazine, or film print—a statement describing where the records are located and naming the person responsible for maintaining the records. *Id.* § 2257(e).

Finally and significantly, the information in the records may *not* be used as evidence in a criminal prosecution, *id.* § 2257(d)(1), with the exception that incomplete records may lead to a criminal presumption that the model was a minor.[10] Presumably created to avoid self-incrimination problems, this restriction also appears to take much of the teeth out of the child pornography prosecution goals of the Act—when authorities find through the records that a model was under 18 years old, the records cannot be used directly or indirectly in prosecutions.

## C. To Whom They Apply

The record-keeping requirements are to be imposed on anyone who "produces," which includes anyone who manufactures, publishes, reproduces, or reissues a book, magazine, periodical, film, videotape, or "other matter." *Id.* § 2257(a), (g)(3). This coverage is fairly clear and very broad. In the context of a photograph, the definition would clearly include both the photograph-

---

**9.** The requirements cover all images first made after February 6, 1978—the date of enactment of the chief federal law criminalizing child pornography.

**10.** See Section IV of this opinion for a discussion of the presumptions.

er and the processor of the film. If the photograph were later reproduced to be placed in a pamphlet, the producer of the pamphlet would be covered and would have to personally contact the model and fulfill the record-keeping requirements. If the photograph is then reproduced in a book years later, the publisher and printer would have to personally re-contact the model. In the context of film production, the definition apparently could include a number of film processors, editors, etc., along the production process, each of whom would have to personally re-contact the performer and fulfill the recordkeeping requirements.[11]

Finally, the record-keeping requirements would *not* apply to libraries or retailers of the image, such as bookstores, newsstands, or movie theaters, unless they were somehow involved in the "production" of the image. These businesses would of course remain subject to prosecution for distribution of child pornography or obscenity.[12]

### D. Analyzing the Constitutionality

■ Laws that burden material protected by the First Amendment must be approached from a skeptical point of view and must be given strict scrutiny. *See, e.g., Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 636–37, 100 S.Ct. 826, 835–36, 63 L.Ed.2d 73 (1980); *NAACP v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963). Indeed, laws that do not prohibit but do regulate First Amendment material are unconstitutional. *See, e.g., FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 107 S.Ct. 616, 626, 93 L.Ed.2d 539 (1986); *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) ("warning" notices from the state to distributors of "indecent" material unconstitutionally intimidated free speech, even though the law was cloaked in terms of targeting obscenity); *American Commu-*

*nications Association v. Douds,* 339 U.S. 382, 402, 70 S.Ct. 674, 685, 94 L.Ed. 925 (1950) (indirect "discouragements" are as coercive on First Amendment rights as direct regulation).

■ Because of the constitutional requirement that protected material may not be infringed, even indirect governmental burdens imposed on protected material may be permitted only under narrow exceptions. If the burden exists through a law that serves a legitimate governmental interest in a field other than regulating protected speech, the legislation still must be narrowly drawn and must not "unnecessarily interfer[e] with First Amendment freedoms." *See, e.g., Village of Schaumburg,* 444 U.S. at 636–37, 100 S.Ct. at 835–36. A law that affects protected expression may be upheld only if it furthers an important or substantial governmental interest, the interest is unrelated to the suppression of free expression, the effect on free expression is only "incidental," and the restriction of First Amendment activity "is no greater than is essential to the furtherance" of the legitimate interest. *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). For example, a government may shut down a bookstore that is a front for a prostitution house; the limitations on the owners' free speech rights are only incidental. *See Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986). The key in determining the constitutionality of a law that "spills over" from a legitimate governmental interest—such as the effort against child pornography—onto protected material is whether the legislation is "narrowly drawn" to avoid as much interference with protected material as possible while furthering the legitimate governmental interest.

---

**11.** It is unclear to the Court whether the term "other matter" would include a drawing or painting made from a live model. If so, every artist in a college class in which drawings are made from a nude model would have to personally ascertain the model's name, age, and other information, if the image is "lascivious," and the paper or canvas was shipped interstate.

**12.** The Attorney General has developed regulations for the record-keeping requirements. *See* 54 Fed.Reg. 8217 (Feb. 27, 1989). The requirements would go into effect on May 17, 1989. *See* 54 Fed.Reg. 18907 (May 3, 1989).

Courts must be especially vigilant in scrutinizing broad legislative efforts that clearly burden protected First Amendment material in the name of attacking things not constitutionally protected. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 64–65, 96 S.Ct. 612, 656–57, 46 L.Ed.2d 659 (1976) ("exacting scrutiny" is necessary "even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct."). Vigilance in this area is appropriate both because of the requirements of strict scrutiny and narrow tailoring and because courts must protect against legislatures that would enact laws that are intended to infringe on protected speech but that are cloaked in terms of an effort against non-protected material.

There has not been a significant amount of case law on this subject, perhaps because legislatures are rightly aware of the dangers of passing such "spillover" legislation. For example, it seems clear that it would be unconstitutional to enact a law that required a novelist and publisher to prove, through documentation of when and where the author came up with the idea for the story, that the book does not infringe on anyone's copyright. Nor would it appear to be constitutional to require that all newspaper articles that criticize governmental officials include in the middle of each article a list of the sources for the story, their addresses, and phone numbers, in a purported attempt to protect against defamation. *See, e.g., Hynes v. Mayor of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976) (holding unconstitutional a law that required persons to register with the government before being allowed to solicit door-to-door or canvass for candidates).

Reviewing the record-keeping requirements of 18 U.S.C. § 2257, the Court concludes that they are unconstitutional because they both (1) burden too heavily and infringe too deeply on the right to produce First Amendment protected material and (2) have not been narrowly tailored to fit the legitimate governmental interest of stopping child pornography.

To say that the record-keeping requirements are onerous is to understate the point. They are not "incidental" burdens; they are direct burdens imposed on much material that is clearly protected by the First Amendment. What makes the requirements extraordinarily burdensome is the remarkable breadth of who must fulfill the record-keeping requirements and how much effort many "producers" would have to take to meet the legal requirements. The result of the requirement that each producer along the stream of commerce must *personally* contact the model or performer and *personally* ascertain the model's or performer's age, current name, maiden name, professional name, and other information will undoubtedly be the effective prohibition of the distribution of much First Amendment protected material. *See, e.g., Bantam Books*, 372 U.S. 58, 83 S.Ct. 631 (state intimidation of free expression is unconstitutional, even if done in the name of targeting obscenity). To take one example, a film distributor who makes copies of films for distribution would be faced with the often-insurmountable task of having to track down personally any performer in a "lascivious" scene, *even if* the original producer of the film provided the distributor with his own documentation of the age of every performer.

Moreover, the Act applies to all depictions made since early 1978 and applies even to images made overseas, where a large percentage of "lascivious" images are created. To require a publisher or producer to travel to Europe or Asia to track down every "lascivious" model or performer shown in a book, magazine, or film originally created a decade earlier is overly burdensome.

The Court also concludes that the record-keeping provisions do not fulfill the First Amendment requirement they be narrowly tailored to meet the needs of child-pornography prosecution. The bulk of the record-keeping under the Act would be imposed on "producers" along the stream of commerce that would otherwise would not have direct

contact with models and performers. A more sensible and narrowly tailored legislative effort might focus on the original photographers, who could be required to document the performer's age and then pass that information along the stream of commerce. Such a system that focused on those that have direct contact with the models and performers could be equally—and perhaps more effective—in ferreting out child pornography, while at the same time not placing unconstitutional burdens on the producers, publishers, and distributors of First Amendment protected material.

Nor are the record-keeping requirements saved by the small exceptions to the general rule against the constitutionality of laws that burden First Amendment material. First, the defendants cite the Supreme Court's long-standing doctrine that legislatures may place justifiable restrictions on the time, place, or manner of protected speech. For example, a local government may restrict erotic material to certain districts, in order to maintain a neighborhood's character. *See, e.g., City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). Zoning restrictions, as well as prohibitions against protests through residential streets in the middle of the night, or against protests with excessively loud bullhorns, fulfill the basic conception of the First Amendment that no one will be censored for his opinions, statements, or pictures, but that the state *can* restrict the speaker if his actions infringe on others' ability to live their own lives—without, for example, being awakened in the middle of the night by a bullhorn. *See, e.g., Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (upholding regulation of public use of sound trucks). The key to the constitutionality of time, place, and manner restrictions is that the government must permit the speech at *some* time, in *some* place, and in *some* manner. The record-keeping requirements scrutinized here do not provide for such limitation of speech to particular times and places; they burden certain protected material at all times and in all places.

Second, the defendants cite *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), for the proposition that record-keeping requirements on First Amendment speech may be constitutional. The election spending and record-keeping requirements scrutinized in *Buckley,* however, differed significantly from the requirements in the instant case. In *Buckley,* the question was whether the need for removing corruption and ensuring integrity in the political process justified direct regulations on campaign activity, which is generally protected by the First Amendment. *Id.* at 66–68, 96 S.Ct. at 657–58. The Court upheld the requirements that it found to be both necessary and narrowly tailored, and struck down others that it found excessively burdened free speech. *See id.* at 19–109, 96 S.Ct. at 634–78; *Brown v. Socialist Worker's '74 Campaign Committee,* 459 U.S. 87, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982) (striking down state election regulations because they were too burdensome). In the instant case, the question again is whether the regulations are justified and are narrowly tailored. This Court concludes that they clearly are not.

Finally, the Court concludes that the record-keeping requirements are not focused narrowly and precisely on helping eliminate the evil of child pornography. Indeed, it is conceivable that these requirements would do as much to hinder protected material as they would to halt child pornography.

First, there is *no* direct sanction for failure to keep or complete the records. Indeed, the information collected by a producer *cannot* "be used, directly or indirectly, as evidence against any person with respect to any violation of law." 18 U.S.C. § 2257(d)(1). It is true that failure to complete the records might lead to a criminal presumption that the performer is under age. *See id.* § 2257(d)(3), (e)(3). However, there can be no sanction if the material is completed and maintained. While a distributor of child pornography would probably think twice about keeping accurate records

that certain performers are under 18 years old, this fact in its records *cannot* be admitted as evidence against him. Indeed, prosecutors would have the added burden of proving that its evidence was not tainted by information gleaned from the records. Moreover, it appears that if a producer lies about the age of the performer, the prosecutor would be unable to take advantage of the presumption unless the prosecutor independently ascertains that the performer was under 18—in which case the records are unnecessary. Indeed, if the producer lies about whether he contacted the performer at all, the prosecution could not take advantage of the presumption unless it somehow could *prove* that the producer lied about contacting the performer. This difficult task appears to be roughly comparable to the task of proving the age of the performer—the difficulty of which presumably was the incentive behind the whole idea for the new law.

Second, it is not true that "mainstream" producers, such as those represented by the plaintiffs, would be free to ignore the record-keeping requirements if they were *sure* that they do not produce child pornography. Because the statute clearly states that all producers "shall" compile the records, 18 U.S.C. § 2257(b), (c), the Court must assume that law-abiding producers will comply with it—either by trying to fulfill the requirements or by supressing material. The Court cannot make the law "constitutional" by assuming that producers will violate the requirements of the statute. Moreover, the surmise that prosecutors may be "unlikely" to prosecute mainstream publishers—a prosecution that would come with a presumption that performers are under 18 if the records are not complete—is of little comfort to producers.

Third, the law would not solve the problem that much of child pornography arises from the underground and black markets. *See* Attorney General's Commission on Pornography, 1 Final Report at 409 (1986). While the Court will not accept the plaintiff's invitation to conclude that "mainstream" producers do not create child pornography, it is clear that a successful effort against child pornography must be cognizant of the fact that much child pornography is not created through aboveboard production means. The fact that the statute in question here does not address this problem does not of course make it unconstitutional; the fact does, however, add to the conclusion that the law is not narrowly and precisely tailored to meet a compelling governmental need.

Finally, the record-keeping requirements would do little to alleviate the problems associated with the incentive of both producers of pornography involving minors and performers under the age of 18—such as teenage prostitutes and runaways—to falsify the age of the performers through false identification and other means. The requirements do nothing to stop publishers and film producers from being fooled by false identification or even from participating in the falsification. Again, the law would put as much, if not more, of a burden on reputable producers of adult images than on the child pornography industry.

The Court concludes therefore, that in addition to being overly burdensome on protected material, the record-keeping requirements are not saved by being tailored precisely to the harm of child pornography. Rather, the record-keeping requirements apparently would do more to infringe, hinder, and in some cases effectively prohibit the production and distribution of protected First Amendment "erotic" material than it would to stop the creation and dissemination of child pornography.

In sum, the Court concludes that the record-keeping provisions of 18 U.S.C. § 2257 are unconstitutional under the First Amendment because they infringe too deeply on First Amendment protected material, do not "incidentally" affect protected material, and are not tailored narrowly enough to pass constitutional scrutiny.[13]

---

**13.** Because the Court concludes that the record-keeping requirements are unconstitutional on these grounds, the Court does not have to address the additional arguments of the plaintiffs that the requirements are unconstitutional on the grounds of self-incrimination or the takings clause.

Accordingly, the Court GRANTS the plaintiffs' motions for an injunction and for summary judgment on this issue, declares 18 U.S.C. § 2257 to be unconstitutional, and enjoins the defendants from enforcing its provisions.

## IV. The Criminal Presumptions

■ The record-keeping section also provides for criminal presumptions for failure to complete the record-keeping requirements. It states:

> In a prosecution of any person to whom [the record-keeping section] applies for [a child pornography offense] which has as an element the production of a visual depiction of a minor engaging in or assisting another person to engage in sexually explicit conduct and in which that element is sought to be established by showing that a performer within the meaning of this section is a minor—
>
> > (A) proof that the person failed to comply with the provisions ... concerning the creation and maintenance of records, or a regulation issued pursuant thereto, shall raise a rebuttable presumption that such performer was a minor....

18 U.S.C. § 2257(d)(3); see also 18 U.S.C. § 2257(e)(3) (same presumption for transportation offenses). The subsection also provides that failure to affix to the material the statement of where the records are kept, id. § 2257(e), will create the presumption "that every performer in the matter was a minor." Id. § 2257(d)(3)(B).

The Supreme Court has been skeptical of presumptions in criminal cases, because of the due process requirement that a person is considered innocent until proven guilty.[14] Criminal presumptions are permissible only if "it can at least be said with substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend." Leary v. United States, 395 U.S. 6, 36, 89 S.Ct. 1532, 1548, 23 L.Ed.2d 57 (1969) (striking down a presumption that marijuana controlled by the defendant was imported illegally). Whether this requirement is met must depend on courts' judgment of human behavior, with the room for error necessarily working against the constitutionality of the presumption. Thus, in a prosecution for illegal possession of weapons, there may be a presumption that a person driving a car "possessed" any weapons in the car. Ulster County Court v. Allen, 442 U.S. 140, 163–67, 99 S.Ct. 2213, 2227–30, 60 L.Ed.2d 777 (1979). On the other hand, for example, it appears clear that there may not be a presumption, if the driver was seen smoking a cigarette, that the cigarette was a marijuana cigarette.

Both the strengths and the faults of the presumptions at issue here arise from the fact that it is often difficult, if not impossible, to determine from looking at a nude image whether the performer is at least 18 years old. The defendants argue that the presumptions are necessary to be able to prosecute child pornographers successfully. Yet, at the same time, the presumptions apparently would often make it impossible for a person prosecuted for failing to properly maintain the records to overcome the presumption without having to find and bring the model, along with his or her identification, into court.

The Court acknowledges that the presumptions would overcome an obstacle to the prosecution of child pornographers—proving the age of the model or performer. However, just because a provision would help prosecution does not justify it constitutionally. See United States v. Romano, 382 U.S. 136, 141, 86 S.Ct. 279, 282, 15 L.Ed.2d 210 (1965) (striking down an inference from the defendant's presence at a still that the defendant was in control of the still, despite the acknowledged problems of trying to prove who controls stills.) Indeed, even the traditionally strict liability offenses of statutory rape and selling alcohol to minors have not included criminal presumptions that the person involved was

---

**14.** The plaintiffs probably would be barred from challenging the constitutionality of the presumptions because of ripeness and standing problems, see Ulster County Court v. Allen, 442 U.S. 140, 154–55, 99 S.Ct. 2213, 2223–24, 60 L.Ed.2d 777 (1979), were it not for the exception for presumptions that clearly implicate First Amendment material. Id.

a minor—and these offenses do not threaten prosecution for First Amendment protected activity, as would prosecution for failure to complete the records under 18 U.S.C. § 2257.

■ The Court concludes that the criminal presumptions are unconstitutional because of the serious potential for convicting persons who have not engaged in child pornography. The presumptions do not appear to involve a "substantial assurance that the presumed fact is more likely than not to flow from the proved fact." *Leary,* 395 U.S. at 36, 89 S.Ct. at 1548. Moreover, the presumptions here are not saved by the fact that child pornography is hard to prove. The due process right of the accused to be assumed innocent until proven guilty beyond a reasonable doubt must not be cast aside merely because of difficulties in convicting a certain class of criminals. Finally, the presumptions clearly clash with the constitutionally required "presumption that expressive materials are protected by the First Amendment" until proven otherwise. *Fort Wayne Books, Inc. v. Indiana,* —— U.S. ——, 109 S.Ct. 916, 929, 103 L.Ed. 2d 34 (1989).

The Court's decision is bolstered by the fact that there are other weapons in the government's arsenal for legal action against child pornographers. For example, forfeiture and other civil penalties, which require a considerably lower standard of proof, are used to fight obscenity, *see Fort Wayne Books,* 109 S.Ct. at 921, 927–30 (setting out the constitutional standards for civil forfeiture of obscenity), and may prove as valuable to the fight against child pornography as the criminal presumptions would be.

■ The Court's decision also is compelled by the fact that convictions through use of the presumptions might be obtained for reasons that offend due process. First, the Supreme Court has held that failure to fulfill a record-keeping requirement cannot lead to criminal conviction when there is no "actual knowledge of the duty" to comply with the law. *Lambert v. California,* 355 U.S. 225, 229, 78 S.Ct. 240, 243, 2 L.Ed.2d 228 (1957). Although it is true that this statute is not a typical record-keeping law, it still offends due process to convict a person of a substantive offense through a presumption of guilt for failure to complete records, without any direct proof of the substantive offense.[15] Second, the Court notes that although the Supreme Court has upheld general use of the term "lascivious" in connection with child pornography, *see, e.g., Hamling v. United States,* 418 U.S. 87, 98–99, 94 S.Ct. 2887, 2897–98, 41 L.Ed. 2d 590 (1974), it is another matter altogether to convict a person for a child pornography offense merely because of a presumption created by the person's mistaken impression that an image was not "lascivious." When a person makes such a mistake and the model cannot be located, the person may find it impossible to overcome the presumption, even though the prosecution also has no evidence that the model or performer was not 18 years old.

■ Finally, the presumptions are constitutionally unacceptable because of their remarkably broad scope. The presumptions do not apply merely when the age of the model or performer has not been recorded, but when *any* of the information has not been generated and maintained. Thus, for example, the failure to record a model's maiden name could lead to a presumption that the model was a minor, even if the records clearly stated that the model or performer was ascertained to be at least 18 years old.[16] Doubtless this aspect was created to enable authorities to find the model and verify his or her age, and it would be hoped that persons would not be prosecuted for child pornography merely for failing to complete parts of the record not having to do with the age of the model.

---

**15.** Although it may be argued that this Court should try to modify judicially the presumptions to cure this and other defects, the Court has concluded, for all of the reasons stated in the text, that the presumptions are so flawed that they must be struck down entirely.

**16.** The statute is unclear whether the statement of the model's or performer's age in an incomplete § 2257 record could be used by the defendant to overcome the presumption.

When dealing with laws that affect the dissemination of First Amendment material, however, a court cannot assume that a law will *not* be enforced in the manner in which it *may* be enforced.

In sum, the criminal presumptions of 18 U.S.C. § 2257(d)(3) and (e)(3) take away from the criminal defendant the right to be presumed innocent until proven guilty beyond a reasonable doubt. They are unconstitutional because the presumed fact does not appear more likely than not to flow from the proven fact. While the problem of proving the age of models and performers in pornography prosecutions is a difficult one, this problem does not alone justify removing from the criminal justice system the basic rights of due process. Accordingly, the Court GRANTS the plaintiffs' motions for an injunction and for summary judgment on this issue, declares the presumption provisions unconstitutional, and enjoins the defendants from enforcing them.

## V. The Forfeiture and Seizure Provisions

### A. Ripeness

■ The threshold question with regard to these provisions is whether the plaintiffs' challenge to the forfeiture provisions is ripe, considering that the forfeiture provisions have not been enforced against the plaintiffs and none can seriously argue that they are in imminent danger of having material seized. While it is true that in *Fort Wayne Books, Inc. v. Indiana,* —— U.S. ——, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989), the majority refused to rule on challenges to the constitutionality of civil post-trial forfeiture, *id.* 109 S.Ct. at 928 and n. 11, the *Fort Wayne Books* case did not overturn a long line of opinions holding that laws implicating infringements on the First Amendment may be challenged on their face, without any imminent danger of prosecution. *See, e.g., Virginia v. American Booksellers Association, Inc.,* 484 U.S. 383, 108 S.Ct. 636, 642, 98 L.Ed.2d 782 (1988); *Dombrowski v. Pfister,* 380 U.S. 479, 486–87, 85 S.Ct. 1116, 1120–22, 14 L.Ed.2d 22 (1965) (holding that the threat of sanctions may deter the exercise of First Amendment rights almost as potently as the actual application of sanctions).

The standing of a single business that was *not* charged with civil post-trial forfeiture—such as the petitioner in *Fort Wayne Books*—is decidedly different from the standing of the large organizations in the instant case that allege that their First Amendment business operations are being significantly affected by the threat of the forfeiture provisions. Indeed, for many aspects of the new forfeiture law, the unconstitutional harm to protected material might be caused by the seizure alone, and could not be fully remedied by post-seizure legal action.[17] Accordingly, the Court concludes that the plaintiffs' challenge to the forefeiture provisions is ripe for review.

### B. The Supreme Court's Forfeiture Decisions

The use of forfeiture is a powerful new weapon in the fight against organized crime operations. Commonly, as in the sections challenged here, forfeiture is not limited to goods considered to be "contraband;" the provisions authorize forfeiture of any and all property used in, to promote, or obtained from the commission of the crime. *See* 18 U.S.C. §§ 1467(a), 2253(a), 2254(a). The Supreme Court, however, has given somewhat mixed signals regarding the use of forfeiture and pre-trial seizure when First Amendment materials are involved.

In *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986), the Court ruled that the state may close a bookstore that was used as a place for prostitution, despite the fact that the closure would affect the sale of some First Amendment protected books. Noting that the state law at issue "was directed at unlawful conduct having nothing to do with books or other expressive activity," *id.* 478

---

17. The Court does not believe that certain issues are not ripe for review merely because the Justice Department has "indicated" that it will not seek pre-trial seizure of presumptively protected First Amendment material. *See* Defendants' Memorandum at 60–61.

U.S. at 707, 106 S.Ct. at 3178, the Court concluded that the closure did not invoke First Amendment protection. *Id.* at 705–07, 106 S.Ct. at 3176–78. *See also United States v. Pryba,* 674 F.Supp. 1504 (E.D.Va. 1987) (permitting RICO forfeiture to be used with in an obscenity prosecution). Stating that "First Amendment values may not be invoked by merely linking the words 'sex' and 'books,'" *Arcara,* 478 U.S. at 705, 106 S.Ct. at 3176, the Court ruled that "Bookselling in an establishment used for prostitution does not confer First Amendment coverage to defeat a valid statute aimed at penalizing and terminating illegal uses of premises." *Id.* at 707, 106 S.Ct. at 3178.

The ruling in *Arcara* clearly did *not,* however, give a green light to seizure or forfeiture of any and all First Amendment protected material by any sort of business merely because the business was engaged in some criminal behavior. Indeed, in *Arcara* the Court made considerable use of the facts (1) that the bookstore was in part a front for prostitution and other "lewd" behavior that could not be stopped without closing the premises, *id.* at 707, 106 S.Ct. at 3178, and (2) that the owners of the bookstore could move their business elsewhere, *id.* at 706, 106 S.Ct. at 3177.

In the recent opinion in *Fort Wayne Books, Inc. v. Indiana,* — U.S. —, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989), the Supreme Court again hinted that, post-trial or post-conviction, it made little difference whether or not the seized property was First Amendment protected material. While deciding that review of Indiana's post-trial sanctions for engaging in obscenity racketeering was not ripe, the majority stated that "we assume without deciding that bookstores and their contents are forfeitable (like other property such as a bank account or a yacht) when it is proved that these items are property actually used in, or derived from, a pattern of violations of the States' obscenity laws." *Id.* 109 S.Ct. at 928.

The Court did, however, invoke the First Amendment in reviewing and striking down the state's *ex parte* pre-trial seizure of First Amendment protected property based on a showing of "probable cause" that a pattern of obscenity violations had occurred. The Court's decisions, it wrote, "firmly hold that mere probable cause to believe that a legal violation has transpired is not adequate to remove books or films from circulation." *Id.* at 929 (citing, e.g., *Heller v. New York,* 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973)). What is problematic is that the Court's ruling seemed to be based in part on the fact that the Court "has repeatedly held that rigorous procedural safeguards must be employed before expressive materials can be seized as 'obscene.'" *Id.* 109 S.Ct. at 927. Under the forfeiture provisions, however, there is never any determination that the forfeited material is "obscene"—the laws provide for forfeiture of *any* property used in, to promote, or obtained from the commission of the offense, whether or not it is "obscene" material, First Amendment protected material, or non-expressive material.

Nonetheless, this Court can glean from the *Fort Wayne Books* opinion a clear proscription against pre-trial seizure of material protected by the First Amendment from a business that is primarily engaged in producing or selling expressive material. To allow pre-trial seizure of entire bookstores upon a showing that just two pieces of probably obscene material have been sold—as occurred in the Indiana case—offends the Supreme Court's holdings against unduly "interrupting the flow of expressive materials." *See id.* at 927–30.

As for post-trial or post-conviction forfeiture, the majority in *Fort Wayne Books* decided that the issue was not ripe for review. 109 S.Ct. at 928 and n. 11. While three justices reached the issue and concluded that the broad sanctions were unconstitutional, 109 S.Ct. at 935, 938–39 (Stevens, J., concurring in part and dissenting in part), the *Arcara* decision and the hints of the majority in *Fort Wayne Books* lead this Court to conclude that the Supreme Court would *not* strike down as unconstitutional on its face the post-trial forfeiture provisions challenged here. This Court could imagine that certain post-conviction forfeiture orders would clearly offend the

First Amendment—for example, a forfeiture of the entire assets of a major, nationwide publisher, including the only retail copies of certain books concerning core First Amendment political speech, for a single violation of the obscenity or child pornography laws. It seems clear to this Court, however, that these concerns, for the time being, can and should be dealt with on a case-by-case basis.

Finally, the Court notes that its conclusions are guided by the principles that it must, when reasonable, interpret a law in a manner that makes it constitutional, and must strike down only those aspects that it finds to be unconstitutional.

### C. Civil Forfeiture

The 1988 Act created a civil forfeiture scheme. 18 U.S.C. § 2254. In addition to providing for forfeiture of "[a]ny visual depiction" of pornography involving minors, the provision authorizes forfeiture of any "[a]ny property, real, or personal, used or intended to be used to commit or to promote the commission" of the offense. *Id.* § 2254(a). Like the law at issue in *Fort Wayne Books*, the 1988 Act "allow[s] prosecutors to cast wide nets and seize, upon a showing that two obscene materials have been sold, or even just exhibited, all a store's books, magazines, films, and videotapes—the obscene, those nonobscene yet sexually explicit, even those devoid of sexual reference." *Id.* at 937 (Stevens, J., concurring in part and dissenting in part). The section provides for seizure and forfeiture procedures according to customs laws and the Supplemental Rules for Certain Admiralty and Maritime Claims ("Admiralty Rules"). *See id.* § 2254(b), (d). For a number of reasons, the Court concludes that aspects of the civil forfeiture provision are unconstitutional.

Under this scheme, an authorized federal agent may seize property based on a showing of "probable cause," which for seizure purposes has been held to be "a reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion." *United States v. Twenty–Two Thousand Two Hundred Eighty Seven Dollars*, 709 F.2d 442, 446–47 (6th Cir.1983) (citation omitted). A warrant may be issued by filing *ex parte* a complaint with the clerk of the court, who may in turn issue the warrant without referring the matter to a judge or magistrate. Admiralty Rule C(3). Thus, it is clear that a large amount of assets—books, printing presses, films, etc.—may be seized based solely on an *ex parte* showing of probable cause.[18] The Supreme Court has clearly stated, however, that "while the general rule under the Fourth Amendment is that any and all contraband, instrumentalities, and evidence of crimes may be seized on probable cause (and even without a warrant in various circumstances), it is otherwise when materials presumptively protected by the First Amendment are involved." *Fort Wayne Books*, 109 S.Ct. at 927. Indeed, the Supreme Court cases "firmly hold that mere probable cause to believe that a legal violation has transpired is not adequate to remove books or films from circulation." *Fort Wayne Books*, 109 S.Ct. at 929 (citing, e.g., *Heller v. New York*, 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973)). First Amendment material may not be taken out of circulation completely until there has been a "judicial determination of the obscenity issue in an adversary proceeding." *Fort Wayne Books*, 109 S.Ct. at 927 (quoting *Heller*, 413 U.S. at 492–93, 93 S.Ct. at 2794–95); *see Marcus v. Search Warrant*, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961). The First Amendment's presumption for expressive materials must apply whether the alleged offense is child pornography or obscenity.[19]

18. An obvious and crucial question is whether failure to complete the record-keeping requirements of § 2257 would fulfill the "probable cause" requirement. Because § 2257(d)(3) states that a criminal presumption that the depicted person is a minor is created when the records are not complete, it would appear that failure to complete the records completely could lead to a showing of "probable cause."

19. In *Fort Wayne Books,* the Supreme Court reserved judgment on the issue whether pre-trial seizure of non-expressive material was invalid. 109 S.Ct. at 929 n. 12. Because the Court in the

■ Moreover, the forfeiture provision unconstitutionally authorizes seizure of expressive materials without a warrant when "incident to an arrest," 18 U.S.C. § 2254(b), clearly in violation of the ruling in *Roaden v. Kentucky*, 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973). The exception to the Fourth Amendment permitting searches and seizures incident to arrest arose from the need to protect the police officer from attack and to ensure the arrested person was not able to quickly destroy evidence near his grasp before he is taken away. The doctrine was never meant to permit seizure of all the assets of a business—especially one that primarily engages in distributing expressive material.

■ Finally, Section 2254 also unconstitutionally fails to require that a quick judicial determination be made as to the legality of the seizure. If the value of the seized materials does not exceed $100,000 in value, the materials may be destroyed unless the person from whom the materials were seized initiates legal proceedings for their return. 19 U.S.C. §§ 1607–1609 (customs laws for seizure and forfeiture). If the value of the material seized is at least $100,000, the government may initiate a judicial proceeding to determine whether the material is subject to permanent forfeiture at any time within five years after "the alleged offense was discovered." 19 U.S.C. § 1621. While these draconian seizure rules may be appropriate for contraband seized on the oceans, they are intolerable for expressive material that is "presumptively protected by the First Amendment." *Fort Wayne Books*, 109 S.Ct. at 927. Indeed, it is clear that when the government seizes expressive material, the law must provide for prompt judicial review of the seizure "within a specified brief period." *See United States v. Thirty–Sev-*

*en Photographs*, 402 U.S. 363, 367, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822 (1971).[20]

Accordingly, the Court GRANTS in part the plaintiffs' motions for an injunction and for summary judgment on this issue, declares 18 U.S.C. § 2254(b) and (d) to be unconstitutional, and enjoins the defendants from enforcing the seizure or forfeiture provisions unless there has been a prior adversarial proceeding.

### D. Criminal Forfeiture Before Conviction

■ The 1988 Act also established forfeiture schemes related to criminal prosecution for obscenity violations, 18 U.S.C. § 1467, and child pornography, 18 U.S.C. § 2253. Like the civil forfeiture provisions, the criminal forfeiture sections authorize seizure of material used in, to promote, or obtained from the commission of the offense, based solely on a showing of "probable cause." 18 U.S.C. §§ 1467(d), 2253(d). In addition, the sections provide for *ex parte* restraining orders and injunctions. 18 U.S.C. §§ 1467(c), 2253(c). Because of the reasons expressed in this opinion's treatment of the civil forfeiture provisions—most importantly, the *Fort Wayne Books* opinion—the Court concludes that seizure or restraint under these sections without a prior adversarial hearing is unconstitutional. Accordingly, the Court GRANTS in part the plaintiffs' motions for an injunction and for summary judgment on this issue, and enjoins the defendants from enforcing 18 U.S.C. § 1467(c) and (d) and 18 U.S.C. § 2253(c) and (d) unless there has been a prior adversarial proceeding.

### E. Criminal Forfeiture After Conviction

■ In addition, the plaintiffs challenge the mandatory post-conviction forfeitures

---

*instant case* concludes that the seizure of non-expressive assets—such as printing presses, bank accounts, etc.—of a business engaged in distributing expressive material may determine whether the business is able to continue functioning or not, the Court concludes that pre-trial seizure of non-expressive material *ex parte* from a business engaged in distributing expressive material also is unconstitutional.

**20.** While the Court concludes that aspects of the pre-trial forfeiture provisions are unconstitutional because of specific constitutional defects, the Court rejects the plaintiffs' broader arguments that the provisions are completely unconstitutional because they represent "prior restraint" or because they would "chill" free speech. *See* pages 36–40 of this opinion for a discussion of the prior restraint and chill issues.

of any property or assets used in, to promote, or obtained by the commission of obscenity or child pornography offense. 18 U.S.C. §§ 1467(a), 2253(a). The scope is not any broader than that for pre-conviction seizure. Indeed, section 1467(a)(3) contains a minor qualification that the court is to take into consideration "the nature, scope, and proportionality of the use of the property in the offense"—a statement not included in the civil forfeiture law, 18 U.S. C. § 2254(a)(3).

First, the plaintiffs argue that the post-conviction forfeiture provisions are facially unconstitutional because they (1) amount to "prior restraint" and (2) improperly "chill" free speech. The Court disagrees.

The seminal decision on "prior restraint," *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), involved the state's enjoining a person from publishing defamatory material in the future, based on the fact that the person had printed such material the past. The Supreme Court held this prior restraint to be unconstitutional, concluding that restraint of future speech based on a finding that past speech was unprotected was "the essence of censorship." *Near,* 283 U.S. at 713, 51 S.Ct. at 630.

■ It is true that the forfeiture laws in question here, like the injunction in *Near,* undoubtedly exist in order to ensure that the business is destroyed root and stem. *See* Attorney General's Commission on Pornography, 1 Final Report 465–472. The Court cannot, however, conclude that this policy decision on its face is unconstitutional. In *Arcara,* the Supreme Court ruled that the closure of an entire bookstore for criminal violations in it did not violate the First Amendment. Moreover, in *Fort Wayne Books,* the Supreme Court approved the use of Indiana's RICO law to attack a bookstore. While three justices in *Fort Wayne Books* held that post-trial forfeiture of a bookstore's assets would be unconstitutional, the majority ruled that "we assume without deciding that book-

stores and their contents are forfeitable (like other property such as a bank account or a yacht)." 109 S.Ct. at 928. Following the logic in *Arcara,* forfeiture may be ordered for assets used in, to promote, or obtained from a criminal violation, whether or not these assets "incidentally" happen to include expressive materials. Under such logic, the forfeiture is *not* "prior restraint."

The Court in the instant case can imagine that some post-conviction forfeitures of bookstores and other businesses that engage primarily in expressive activity could be so broad that they violate the First Amendment by removing from circulation considerable amounts of protected material. For now, such cases can be dealt with on a case-by-case basis.

Another factor distinguishing the forfeiture schemes challenged here from the "prior restraint" doctrine is that forfeiture does not restrain the activities of the person or business in the future; it only takes from them assets that they have accumulated before conviction. Under the schemes at issue here, the convicted person or business is not enjoined from and is legally free to engage in the production and distribution of any expressive material after the forfeiture—even though expressive material may have been seized. Critics might argue that the distinction is splitting hairs, but this is the stuff of First Amendment analysis.[21]

Finally, the Court does not accept in whole the plaintiffs' argument that the post-conviction laws are facially unconstitutional because they "chill" protected speech. It is true that because the line between material protected by the First Amendment and that sanctionable as unprotected expression often is less than clear to a distributor of expressive materials, a "threat of sanctions may deter their exercise almost as potently as the actual application of sanctions." *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). The potential conse-

---

**21.** The fact that criminal punishment—whether it is by fine, incarceration, etc.—makes it physically difficult for the person to engage in First Amendment activity does make the punishment unlawful "prior restraint," as long as the person legally is unrestrained to engage in speech.

quences of a wrong determination whether certain material is protected may force distributors to "steer far wider of the unlawful zone." *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958); *see* R. Posner, *Economic Analysis of Law* 207 (3d ed. 1986); Erlich, *The Deterrent Effect of Criminal Law Enforcement*, 1 J. Legal Stud. 259 (1972).

Yet this broad deterrent effect exists in any criminal scheme, including when obscenity itself is penalized by criminal punishment. The courts must attempt to choose which laws have too great a "chilling" or deterrent effect on free speech to survive constitutional scrutiny. It is true that the forfeiture provisions at issue here "arm prosecutors not with scalpels to excise obscene portions of an adult bookstore's inventory but with sickles to mow down the entire undesired use." *Fort Wayne Books*, 109 S.Ct. at 939 (Stevens, J., concurring in part and dissenting in part). But it is not clear that forfeiture will "chill" speech any more than do criminal punishment and imprisonment, which is undeniably permitted for obscenity violations. While once again the Court can imagine that overly broad interpretations of the post-conviction forfeiture provisions could lead to an intolerable "chill" of First Amendment activity, the Court believes that the sections as written are not facially unconstitutional. Such a standard for a constitutional interpretation of the forfeiture provisions should be drawn after the courts have had an opportunity to evaluate the use of the forfeiture provisions and their effect.

■ In addition, the plaintiffs challenge 18 U.S.C. § 1467(j), which authorizes a United States District Court to order the forfeiture of property without regard to the location of the property. Thus, for example, a conviction for distributing obscenity in community A would lead to forfeiture of the defendant's property in community B, without any determination whether community B would find the material that was the basis for the conviction to be "obscene" in its eyes. The plaintiffs claim that the provision runs counter to the federalist thrust of the test in *Miller*, which depends on "contemporary community standards." 413 U.S. at 24, 37, 93 S.Ct. at 2615, 2622. Under *Miller*, a person may be convicted for obscenity violations only if the jury concludes that *its* community would find the material to be "obscene." *Id.*

The Court concludes that the provision is *not* unconstitutional under the *Miller* doctrine. First, the Court notes that forfeiture is authorized not because the community that has convicted the person has determined that the forfeited assets are "obscene"—this is irrelevant under forfeiture. The only thing that matters is whether the assets were used in, to promote, or obtained from an activity that a certain community has determined involved "obscenity." Indeed, a person who lives in community B but who has distributed material to community A that the latter community finds to be "obscene" may find himself in prison in community A, even though his home community might not have convicted him, and even though he may never physically have entered community A. If a person may be "forfeited" through a conviction in a community other than his own, it appears to the Court that the person's property may be forfeited, even though it is not in the locale that handed down the conviction.[22] While seizure of assets undoubtedly would involve seizing expressive material, the seizure is done *not* because of a determination that they are "obscene."[23]

There are, however, certain aspects of the post-conviction forfeiture scheme that the Court concludes are unconstitutional.

■ First, after a conviction for an obscenity or child pornography offense, the

---

**22.** Again, the Court can conceive of certain sweeping post-trial forfeitures of businesses engaged in distributing expressive material that would offend the First Amendment. Such cases can and should, however, be handled on a case-by-case basis.

**23.** Of course, the court cannot order seizure or forfeiture of material *outside* of the relevant community that was *not* used in, to promote, or obtained from the offense, merely because the community deems it to be "obscene."

488

criminal forfeiture sections state that only persons "other than the defendant or person acting in concert with him or on his behalf" may obtain a stay of "disposition" of the forfeited property pending appeal. 18 U.S.C. §§ 1467(g), 2253(g).[24] If this section were interpreted to prohibit a defendant from obtaining a stay with regard to the destruction or sale of the forfeited material pending appeal, it would essentially eviscerate the constitutional right to appeal the forfeiture. It is not typical that forfeiture pursuant to conviction cannot be stayed pending appeal. *See, e.g.,* Fed.R. Crim.P. 38(e) (permitting stay of forfeiture resulting from certain RICO or drug convictions). The unfairness of such an interpretation is heightened by the fact that forfeitures under sections 1467 and 2253 would likely involve expressive material. Therefore, the Court concludes that 18 U.S. C. §§ 1467(g) and 2253(g) must be interpreted so as to permit the defendant to obtain a stay pending appeal.

■ Second, the Court notes that the forfeiture provisions of the 1988 Act—unlike the Racketeering Influenced and Corrupt Practices Act (RICO), to which the government consistently analogizes the statutory scheme at issue here [25] and which requires a "pattern" of activity, 18 U.S.C. § 1962—permit forfeiture for *any* violation of the listed obscenity or child pornography laws, regardless of whether or not there was a "pattern" of activity. 18 U.S.C. §§ 1467, 2253. Thus, the laws at issue here appear to authorize forfeiture of vast amounts of assets—everything from First Amendment protected material to bank accounts—for a single violation.

The general rationale for provisions authorizing forfeiture is that the property to be forfeited is considered to be part of, or obtained through, criminal "enterprises." *Testimony of H. Robert Showers, Executive Director of the National Obscenity Enforcement Unit, U.S. Department of Justice, before the House Judiciary Committee* at 13, June 8, 1988 (discussing the 1988 Act's forfeiture provisions); *see Fort Wayne Books,* 109 S.Ct. at 924–26. To impose the sweeping forfeiture provisions on persons or businesses that have committed a *single* violation would both unnecessarily chill free speech. Limiting the forfeiture provisions to cases involving "patterns" of criminal behavior—as in RICO—would give the forfeiture provisions their full effect on obscenity and child pornography enterprises, without imposing the specter of the corporate "death penalty" for a single violation of laws for which the line between crime and the First Amendment is "dim and uncertain." *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 66, 83 S.Ct. 631, 637, 9 L.Ed.2d 584 (1963).

■ In sum, the Court concludes that the post-conviction forfeiture provisions are *not* as a whole facially unconstitutional. However, the Court concludes that post-conviction forfeiture may be ordered only when there has been a "pattern" of activity. Accordingly, the Court GRANTS in part and DENIES in part both the plaintiffs' and the defendants' motions for summary judgment on this issue, to the extent that (1) the Court declares that 18 U.S.C. § 1467(g) and 18 U.S.C. § 2253(g) must be interpreted to give the defendant the right to obtain a stay pending appeal, and (2) the Court enjoins the defendants from enforcing the forfeiture provisions of 18 U.S.C. § 1467 and § 2253 unless there has been shown a "pattern" of criminal activity.

---

**24.** Because the material at issue here would likely include magazines, books, or films that included nudity, it would be expected that "disposition" would often mean destruction of the material, authorized by 18 U.S.C. §§ 1467(g), 2253(g).

**25.** The Indiana RICO law that was the subject of *Fort Wayne Books* also included a requirement that there be a "pattern" of activity. 109 S.Ct. at 921.