UNITED STATES of America

v.

CALIFORNIA PUBLISHERS LIQUI-
DATING CORP., Video Team, Inc., In-
vestment Enterprises, Inc. d/b/a Great
Western Litho Bindery, Donald P.
Browning, and Michael Warner.

Crim. No. 3-90-318-H.

United States District Court,
N.D. Texas,
Dallas Division.

Oct. 17, 1991.

Marvin Collins, U.S. Atty. by Paul D. Macaluso, Asst. U.S. Atty., Dallas, Tex., Ruth E. Plagenhoef Trial Atty., U.S. Dept. of Justice, Crim. Div., Washington, D.C., for the Government.

Anthony Michael Glassman, Stephen J. Rawson, Glassman & Browning, Beverly Hills, Cal., Marcia A. Morrissey, Los Angeles, Cal., John H. Weston, Weston & Sarno, Beverly Hills, Cal., Paul J. Cambria, Jr., Lipsitz Green Fahringer Roll Salisbury & Cambria, Buffalo, N.Y., Roy R. Barrera, Nichols & Barrera, San Antonio, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

SANDERS, Chief Judge.

Before the Court are the Government's Motion for Forfeiture, filed September 9, 1991, Defendants' Reply Memorandum, filed October 1, 1991, and related pleadings.

This is a case of first impression. By the present motion, the Government asks the Court to order forfeit real and personal properties belonging to the Defendants pursuant to 18 U.S.C. § 1467. For the reasons given below, the Court concludes that the Government's motion should be DENIED.

### I. Facts.

On November 30, 1990 a federal Grand Jury in Dallas, Texas returned an eight-count indictment against Defendants California Publishers Liquidating Corporation, Video Team, Inc., Investment Enterprises, Inc. (doing business as Great Western Litho & Bindery), Donald P. Browning, Michael Warner, Susan C. Colvin, Christian Mann, and Ron Zdeb. California Publishers Liquidating Corporation ("CPLC") is a California Corporation with its principal place of business in Los Angeles, California. CPLC has been in the business of distributing sexually explicit materials nationwide since 1973. Donald P. Browning is president and a part owner of CPLC, and Susan Colvin is an employee of CPLC. Video Team, Inc. ("Video Team") is a wholly owned subsidiary of CPLC which was formed in December, 1985, and which operates out of the same Los Angeles facility as CPLC. Christian Mann is an employee of Video Team. Investment Enterprises, Inc. (doing business as Great Western Litho & Bindery) ("Great Western") is a California publishing company, located across the street from CPLC. Although a majority of Great Western's business is derived from producing sexual explicit materials or box covers for sexually explicit video tapes (for CPLC, Video Team and any other business wishing to contract for Great Western's services), a substantial portion of its business involves publishing material that is not sexually related. Michael Warner is the president and a part owner of Great Western, and Ron Zdeb is an employee of Great Western. The charges against the Defendants arose from an undercover sting operation run by police in Dallas and the Federal Bureau of Investigation in Los Angeles. Pursuant to a plea agreement with its owner, the Dallas Police Department assumed control of Good Vibrations, Inc. ("Good Vibrations"), a sexually oriented business located in Dallas. Through Good Vibrations, Dallas Police Detective Ronnie Bardin placed several orders with CPLC and Video Team, which resulted in the ship-

ment, by United Parcel Service ("UPS"), of dozens of sexually explicit video tapes from Los Angeles to the Dallas address used by Good Vibrations. (A police facility actually was located at the address to which the video tapes were shipped.) The eight indicted video tapes were among those shipped to Texas via UPS. In addition, Video Team mailed Good Vibrations advertisements for two of the indicted video tapes.

In the first seven counts of the indictment, the Government charged the eight Defendants with conspiracy to transport obscene material in interstate commerce, in violation of 18 U.S.C. § 371; interstate transportation of obscene material, in violation of 18 U.S.C. § 1462; mailing advertisements for obscene material, in violation of 18 U.S.C. § 1461; and aiding and abetting the offenses of interstate transportation of obscene material and mailing advertisements for obscene material, in violation of 18 U.S.C. § 2.[1] By Order entered March 18, 1991 the Court granted the Government's motion to dismiss Counts Two, Three, and Six of the indictment as to Christian Mann on the ground that Mann was not an employee of Video Team at the time of the offenses charged in those Counts.

The case went to trial on July 15, 1991. At the close of the Government's case, all eight Defendants moved for judgments of acquittal, pursuant to Federal Rule of Criminal Procedure 29. The Court granted Ron Zdeb's motion for judgment of acquittal on the ground that the Government failed to meet its burden under Rule 29 to provide evidence about Zdeb's knowledge of the purpose of the alleged conspiracy, to transport obscene materials in interstate commerce. For the same reason—lack of proof of criminal intent—the Court entered judgments of acquittal for Zdeb on the remaining charged offenses. *See* Memorandum Opinion and Order entered July 19, 1991. The Court denied the Rule 29 motions of the other Defendants.

On July 30, 1991 the jury returned its verdict. The jury reached unanimous verdicts only as to Counts One, Two, and Four; it was unable to reach unanimous verdicts as to Counts Three, Five, Six, and Seven. Defendant Christian Mann was acquitted as to Counts One and Four (Count Two having previously been dismissed as to him). The remaining six Defendants—CPLC, Video Team, Great Western, Donald P. Browning, Michael Warner, and Susan C. Colvin—were found guilty on Counts One, Two, and Four. Two video tapes were charged as obscene in each of Counts Two and Four. *See supra* note 1. Although the Court instructed the jury that they would have to unanimously find that at least one video tape charged in a Count was obscene in order to convict a Defendant on that Count, the jury was not required to identify which video tapes they determined to be obscene. The parties have stipulated that two video tapes were found to be obscene, one for Count Two and one for Count Four.[2]

Because of the guilty verdicts returned as to CPLC, Video Team, Great Western, Donald P. Browning, and Michael Warner, the Court proceeded to Count Eight of the

---

**1.** Specifically, Count One of the indictment charged the eight Defendants with conspiracy to violate the laws of the United States, in violation of 18 U.S.C. § 371. The object of the alleged conspiracy was the interstate transportation of obscene video cassette tapes, in violation of 18 U.S.C. § 1462. Counts Two, Three, Four, and Five of the indictment charged the eight Defendants with interstate transportation of obscene video cassette tapes, in violation of 18 U.S.C. § 1462, and aiding and abetting the commission of that offense, in violation of 18 U.S.C. § 2. Each of the four counts charging interstate transportation of obscene material alleged that two videotapes were obscene: "Beyond Taboo" and "Kinky Vision" (Count Two); "All Anal Volume 1" and "John Holmes Volume 4" (Count

Three); "Interracial Anal 1" and "Anal Sluts Volume 2" (Count Four); and "Shaved Sinners" and "Monday Nite Ball" (Count Five). Counts Six and Seven charged the eight Defendants with mailing advertisements for obscene material, in violation of 18 U.S.C. § 1461, and aiding and abetting the commission of that offense, in violation of 18 U.S.C. § 2.

**2.** In its Motion for Forfeiture the Government contends that four video tapes were found obscene by the jury. The Government does not explain the basis for this contention or for its departure from the stipulation entered into with Defendants on the record.

indictment.[3] Count Eight charged that by violating 18 U.S.C. § 1462, as found by the jury in convicting the Defendants on Counts Two and Four, certain properties belonging to CPLC, Video Team, Great Western, Browning, and Warner were subject to forfeiture pursuant to 18 U.S.C. § 1467. These properties included the two tracts of real property in Los Angeles together with the buildings housing the corporate defendants and their contents, and numerous corporate and personal bank accounts. In short, the Government sought forfeiture of the entire businesses of CPLC, Video Team, and Great Western, as well as substantial assets of Warner and Browning, on the basis of a finding that two video tapes are obscene in Dallas, Texas. The Government seeks these forfeitures in addition to the fines and terms of imprisonment provided by Title 18, United States Code, Sections 371 and 1462. The Government did not seek forfeiture of properties with no connection to the offenses charged in the indictment, such as the Defendants' homes and other businesses.

The Court submitted the forfeiture issue to the jury, which returned a special verdict on August 1, 1991.[4] The jury found that the two parcels of real property and four corporate bank accounts were subject to forfeiture. The jury did not find that personal bank accounts in the names of Michael Warner and Donald Browning were subject to forfeiture.

The Court subsequently held a conference and received briefing on the motion presently before the Court, namely, what proportion of the property found by the jury to be subject to forfeiture, if any,

should be forfeited to the Government under 18 U.S.C. § 1467.

## II. Discussion.

Title 18, United States Code, Section 1467 was passed as part of the Child Protection and Obscenity Enforcement Act of 1988 (Subtitle N of the Anti–Drug Abuse Act of 1988), Pub.L. No. 100–690, Title VII, § 7522(a), 102 Stat. 4490 (1988). President Reagan signed the Act into law on November 18, 1988. Section 1467 was amended by the Crime Control Act of 1990, Pub.L. No. 101–647, Title XXXV, § 3549, 104 Stat. 4926 (1990).[5] The portions of Section 1467 most directly relevant to the issues presently before the Court provide as follows.

**§ 1467 Criminal forfeiture**

**(a) Property subject to criminal forfeiture.** A person who is convicted of an offense involving obscene material under this chapter shall forfeit to the United States such person's interest in—

(1) any obscene material produced, transported, mailed, shipped, or received in violation of this chapter;

(2) any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from such offense; and

(3) any property, real or personal, used or intended to be used to commit or to promote the commission of such offense, if the court in its discretion so determines, taking into consideration the nature, scope, and proportionality of the use of the property in the offense.

. . . .

**(e) Order of forfeiture.** The court shall order forfeiture of the property referred to in subsection (a) if—

---

**3.** Although Susan Colvin also was found guilty of violating Section 1462 and was named in Count Eight of the indictment, at trial the Government abandoned its charge against her under Count Eight.

**4.** The Court found that the Government presented no evidence connecting two personal bank accounts—one in the names of Warner, Browning, and Rosalie Tapper, and one in the names of Warner and Vickie Browning—to the Section 1462 offenses, and granted Defendants' Rule 29 motions as to those bank accounts.

**5.** The 1990 amendment of Section 1467 had to do only with the authority of the Attorney General to dispose of property after it is ordered forfeited by the Court. *See* Crime Control Act of 1990, Pub.L. No. 101–647, Title XXXV, § 3549, 104 Stat. 4926 (1990) (amending 18 U.S.C. § 1467(h)(4)). Accordingly, for the purposes of the issues before the Court, Section 1467 was effective as of November 18, 1988.

(1) the trier of fact determines, beyond a reasonable doubt, that such property is subject to forfeiture; and

(2) with respect to the property referred to in subsection (a)(3), if the court exercises the court's discretion under that subsection.

. . . .

**(m) Construction.** This section shall be liberally construed to effectuate its remedial purposes.

**(n) Substitute assets.** If any of the property described in subsection (a), as a result of any act or omission of the defendant—

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third party;

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be divided without difficulty;

the court shall order the forfeiture of any other property of the defendant up to the value of any property described in paragraphs (1) through (5).

The issues presently before the Court concern only the forfeiture of assets under Section 1467(a)(3). In reaching its decision as to forfeiture under that subsection, however, the Court's analysis must extend to other parts of the statute because of the interplay between the various subsections recited above, and because of constitutional issues which pervade the entire statute. The most serious constitutional issues are raised by Defendants' First and Eighth Amendment challenges to the Government's proposed application of Section 1467.

### A. Section 1467(a)(1).

■ The significance of constitutional concerns in construing Section 1467 can be readily seen in its very first provision: "A person who is convicted of an offense involving obscene material under this chapter shall forfeit to the United States such person's interest in any obscene material produced, transported, mailed, shipped, or received in violation of this chapter." 18 U.S.C. § 1467(a)(1). On its face, this provision could reasonably be interpreted to mean that all copies of the video tapes found to be obscene that remain in the Defendants' Los Angeles warehouse are subject to forfeiture. Certainly, such an interpretation seems consistent with the statute's own instruction that it "be liberally construed to effectuate its remedial purposes." *Id.* § 1467(m).

Such an interpretation of Section 1467(a)(1) is, however, impermissible. First, the fact that copies of the obscene video tapes that remain in the possession of the Defendants have not been transported in interstate commerce means that they are not subject to forfeiture by the terms of Section 1467(a)(1). Second, and more important for the purposes of the Court's analysis of the issues presented by this case, is the fact that copies of the video tapes found obscene in Dallas simply are not obscene so long as they are located in Los Angeles—or anywhere other than the Dallas Division of the Northern District of Texas.

This nation's obscenity law is grounded on the concept of diversity, on the proposition, expressed in our federal system of government, that communities throughout the nation should be free to adopt their own standards of acceptance and tolerance of sexually oriented expression. "People in different states vary in their tastes and attitudes, and this diversity is not to be strangled by the absolutism of imposed uniformity." *Miller v. California,* 413 U.S. 15, 33, 93 S.Ct. 2607, 2620, 37 L.Ed.2d 419 (1973). In the seminal *Miller* opinion, the United States Supreme Court stated that "[t]his much has been categorically settled by the Court, that obscene material is unprotected by the First Amendment." *Id.* at 23, 93 S.Ct. at 2614. In establishing a test for obscenity, the Supreme Court ruled that local, rather than national, standards were the constitutionally appropriate means for determining which "works that depict or describe sexual conduct", *id.* at 24, 93 S.Ct. at 2614, are obscene and there-

fore fall outside of the scope of the First Amendment's protection.

> Under a National Constitution, fundamental First Amendment limitations on the powers of the States do not vary from community to community, but this does not mean that there are, or should or can be, fixed, uniform national standards of precisely what appeals to the "prurient interest" or is "patently offensive." These are essentially questions of fact, and our Nation is simply too big and too diverse for this Court to reasonably expect that such standards could be articulated for all 50 States in a single formulation, even assuming the prerequisite consensus exists. When triers of fact are asked to decide whether "the average person, applying contemporary community standards" would consider certain materials "prurient," it would be unrealistic to require that the answer be based on some abstract formulation. The adversary system, with lay jurors as the usual ultimate factfinders in criminal prosecutions, has historically permitted triers of fact to draw on the standards of their community, guided always by limiting instructions on the law. To require ... a *national* "community standard" would be an exercise in futility.

*Id.* at 30, 93 S.Ct. at 2618; *see Jacobellis v. Ohio,* 378 U.S. 184, 200, 84 S.Ct. 1676, 1684, 12 L.Ed.2d 793 (1964) ("It is my belief that when the Court stated in *Roth* that obscenity is to be defined by reference to 'community standards,' it meant community standards—not a national standard, as is sometimes argued."); *Roth v. United States,* 354 U.S. 476, 488–89, 77 S.Ct. 1304, 1310–11, 1 L.Ed.2d 1498 (1957) (holding that an obscenity test based on the application of contemporary community standards withstands the charge of constitutional infirmity).

In the present case, the Government was free to prosecute the Defendants in Los Angeles, where the Defendants' entire video inventory is located, but chose instead to seek convictions from a jury applying the contemporary community standards of Dallas, Texas. Following *Miller* and its progeny, the Court instructed the jury that they were to apply contemporary community standards in determining whether any of the eight indicted video tapes were obscene.[6] The jury found that two of the indicted video tapes are obscene. This finding of fact applies only to those two tapes in Dallas, Texas at the time of the jury's verdict.[7] The obscenity finding does not apply to copies of those tapes presently stored in CPLC's Los Angeles warehouse, for to so hold would mean imposing the contemporary community standards of Dallas on the citizens of Los Angeles and, indeed, on the rest of the United States. It is precisely this sort of "imposed uniformity" that the *Miller* Court found absolutist and abhorrent. In addition, the jury's obscenity finding obviously cannot be applied to any other of the Defendants' thousands of sexually explicit video tapes and other sexually explicit materials. Accordingly, only those copies of the video tapes that were shipped to Dallas and found to be obscene by the jury are obscene for the

6. The court's charge to the jury read in pertinent part as follows:

> For something to be "obscene" the following must be shown:
> **First:** That the average person, applying contemporary adult community standards, would find that the work, taken as a whole, appeals to the prurient interest; and
> **Second:** That the average person, applying contemporary adult community standards, would find that the work depicts or describes sexual conduct in a patently offensive way; and
> **Third:** That a reasonable person would find that the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

> For material to be found obscene it must have all three characteristics.

7. Actually, the community whose standards were applied encompassed the area from which the jury was drawn and selected. Following *United States v. Groner,* 479 F.2d 577, 583 (5th Cir.) (en banc), *vacated on other grounds,* 414 U.S. 969, 94 S.Ct. 278, 38 L.Ed.2d 213 (1973), *on remand,* 494 F.2d 499 (5th Cir.), *cert. denied,* 419 U.S. 1010, 95 S.Ct. 331, 42 L.Ed.2d 285 (1974), the Court instructed the jury that they were to apply the contemporary community standards of the Dallas Division of the Northern District of Texas, which includes the counties of Dallas, Rockwall, Kaufman, Hunt, Ellis, Johnson, and Navarro.

purposes of Section 1467; the remaining copies of those video tapes cannot constitutionally be presumed to be obscene.

Thus, only two video tapes are subject to forfeiture under Section 1467(a)(1). Under different circumstances, of course, more video tapes could be found to be subject to forfeiture—for example, if 100 copies of a video tape found to be obscene had been shipped to Dallas and the recipient had been convicted under Section 1462, then all 100 copies could properly be forfeited. Likewise, had the Government prosecuted this case in Los Angeles, all copies of the two obscene video tapes would be considered obscene for the purposes of Section 1467. Under the facts of this case, however, there are only two obscene video tapes for the purposes of the forfeiture statute. The remaining inventories of CPLC and Video Team clearly are not subject to forfeiture under Section 1467(a)(1); to enter an order of forfeiture of materials not found to be obscene would do violence to the First Amendment's protection from prior restraint. *See Near v. Minnesota,* 283 U.S. 697, 713, 51 S.Ct. 625, 630, 75 L.Ed. 1357 (1931) (finding that prior restraint of speech is "the essence of censorship"); *see also Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 2802, 49 L.Ed.2d 683 (1976) (discussing numerous First Amendment cases and stating that "prior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment rights"); *Universal Amusement Co. v. Vance,* 587 F.2d 159, 165–66 (5th Cir.1978) (finding that a state statute that punishes an obscenity conviction by closing the theater for one year violated the ruling of *Near v. Minnesota* because under the statute "future conduct that may fall within the purview of the first amendment is absolutely prohibited after a finding of unprotected present conduct"), *aff'd,* 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980).

### B. Section 1467(a)(2).

The fact that only two video tapes are obscene is significant when one turns to the other provisions of Section 1467. Section 1467(a)(2), for example, provides that "[a] person who is convicted of an offense involving obscene material under this chapter shall forfeit to the United States such person's interest in ... any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from such offense...." In this case, the parties have stipulated that Video Team received a gross revenue of $9.90 from the sale to Good Vibrations of the two video tapes found by the jury to be obscene. Under Section 1467(a)(2), then, only $9.90 is subject to forfeiture because the video tapes are presumed to be not obscene in all other parts of the country, so proceeds from their sale in other areas cannot be deemed to be proceeds obtained from an offense under the federal obscenity statutes. Likewise, the proceeds Defendants derived from the sale of other sexually explicit video tapes cannot be forfeited under Section 1467(a)(2) for the simple reason that those other tapes were not found to be obscene.

■ At trial, before abandoning its claim under Section 1467(a)(2), the Government argued that not only were the proceeds from the sale of the obscene video tapes subject to forfeiture, but that all funds with which such proceeds had been commingled were also subject to forfeiture. This argument is without merit.

First of all, the statute expressly provides that the property subject to forfeiture must constitute proceeds obtained from the commission of the offense; absolutely nothing in the statute suggests that the Government may obtain the forfeiture of property derived from the sale of nonobscene, and therefore constitutionally protected, materials.

Second, Section 1467(n) provides that where property subject to forfeiture "has been commingled with other property which cannot be divided without difficulty" the Court shall order the forfeiture of substitute assets up to the value of the property found subject to forfeiture. Pursuant to the terms of Section 1467(n), either the $9.90 received by Video Team from the sale of the obscene video tapes is to be divided from other assets not subject to forfeiture,

or substitute assets worth up to $9.90 should be forfeited. Under no tenable interpretation of Section 1467 can all of the funds in the four corporate bank accounts be ordered forfeited simply because $9.90 may have flowed through those accounts. Nor could the Court properly order the forfeiture of the Los Angeles real property where CPLC, Video Team, and Great Western are located under Section 1467(a)(2) were it shown that the $9.90 had been used to purchase the properties; such a penalty clearly is precluded by the substitute assets provision of Section 1467(n).

### C. Section 1467(a)(3).

From this analysis of Section 1467(a)(1) and (a)(2), the Court now addresses the central issue before the Court: the Government's proposed forfeiture under Section 1467(a)(3) of Defendants' interests in two tracts of real property (along with the buildings on those tracts and the contents of the buildings) and four corporate bank accounts. Section 1467(a)(3) provides that "[a] person who is convicted of an offense involving obscene material under this chapter shall forfeit to the United States such person's interest in ... any property, real or personal, used or intended to be used to commit or to promote the commission of such offense, if the court in its discretion so determines, taking into consideration the nature, scope, and proportionality of the use of the property in the offense."

The Government argues that the two tracts of real property and the four bank accounts should all be ordered forfeit. The Government states that "[w]here, as here, a clear pattern of offenses has been shown, the property is of a nature that exclusively supports the marketing and distribution of obscene materials, and the scope of the defendants' business activity is directed largely to that distribution, a forfeiture of the property is not disproportionate." Motion for Forfeiture at 7. The Court disagrees.

President Reagan, acting on the advice of the Attorney General's Commission on Pornography, presented the legislation containing Section 1467 to Congress in November, 1987. *See* Proposed Legislation— Child Protection and Obscenity Enforcement Act of 1987, Message from the President of the United States, H.R.Doc. No. 129, 100th Cong., 1st Sess. (1987) [hereinafter President's Message]; *see also* Attorney General's Commission on Pornography, 1 Final Report 465–72 (1986) (proposing forfeiture laws in order to destroy sexually related businesses). The proposed definition of forfeitable property under subsection (a)(3) was passed into law.[8] *See* President's Message at 16. In urging enactment of the legislation, President Reagan told Congress that it created a

> criminal forfeiture provision[ ] for obscene material, for the profits generated by trafficking in obscene materials and *for certain instrumentalities used to produce such material....*
>
> ... Section 1467 is a criminal forfeiture statute. It is patterned after similar forfeiture provisions applicable to controlled substances, principally 21 U.S.C. 853. Subsection (a) requires that any person convicted of a violation of sections 1461–1466 that involves obscene material shall forfeit the obscene material, "any property, real or personal, constituting or traceable to gross profits or other proceeds" of the offense and "any property, real or personal, used or intended to be used to commit *or* to promote the commission of such offense." *The latter phrase is intended to cover the things used to produce or transport the obscene article.*

*Id.* at 80–82 (footnote omitted and emphasis added).

■■■ The Court begins its analysis by noting that an order of forfeiture under Section 1467(a)(3) is within the sound discretion of the Court, although the Court cannot enter an order of forfeiture under this section unless "the trier of fact deter-

---

**8.** The proposed legislation did not include subsection (e)(2), allowing for the court's discretion in ordering forfeiture under subsection (a)(3), *see* President's Message at 19, nor did it include subsection (a)(3)'s consideration of the "nature, scope, and proportionality of the use of the property in the offense." *See id.* at 16.

mines, beyond a reasonable doubt, that such property is subject to forfeiture". 18 U.S.C. § 1467(e). Accordingly, although the Government originally sought the forfeiture of eight bank accounts and two tracts of real property, only four bank accounts and the two tracts of real estate were found to be subject to forfeiture by the jury. The Court's authority to enter an order of forfeiture obviously does not extend to the four personal bank accounts not found to be subject to forfeiture by the jury.

[5, 6] As Section 1467 makes clear, the Court is constrained in its determination of whether to order forfeiture of property used or intended to be used to commit or to promote the commission of the obscenity offense by the statute's provision requiring consideration of "the nature, scope, and proportionality of the use of the property in the offense." [9] In the present case, the question is whether shipping two obscene video tapes from Los Angeles to Dallas warrants the forfeiture of the Defendants' three businesses.

The Government argues that the proportionality finding incorporated in Section 1467 means no more than that the Court, in its discretion, may evaluate the forfeiture verdict against the Eighth Amendment prohibition against cruel and unusual punishments. Under that test, the Government states, a disproportionate punishment is only one that shocks the conscience. *See* Motion for Forfeiture at 8–14. The Government is incorrect. First of all, the Government inverts the meaning of the statute when it asserts that the Court's proportionality finding is discretionary. It is the order of forfeiture that is discretionary; the plain language of the statute states that if the Court exercises its discretion and orders a forfeiture, it must take into account the nature, scope and proportionality of the use of the property in com-

mitting the offense. The legislative history of the statute supports the Court's interpretation of Section 1467's plain language. "In exercising this discretion [under Section 1467(a)(3)], the court is *required* to take into account the 'nature, scope, and proportionality of the use of the property in the offense.'" Section Analysis of Judiciary Committee Issues in H.R. 5210, 134 Cong.Rec. S17375 (daily ed. Nov. 10, 1988) (statement of Sen. Biden) (emphasis added).

Second, the Government presents no evidence at all indicating that the proportionality provision of Section 1467(a)(3) means "nothing more" than that the Court may evaluate the requested forfeiture in light of the Eighth Amendment's prohibition against cruel and unusual punishments. The entirety of the Government's argument on this point is contained in one sentence: "In enacting the new obscenity criminal forfeiture statute, Congress was aware of the tension in the Circuits regarding the Eighth Amendment challenges to forfeiture verdicts handed down in drug cases." Motion for Forfeiture at 12. The case law and the legislative history cited by the Government in support of this contention deals not with the Eighth Amendment, but with First Amendment concerns regarding forfeiture of constitutionally protected materials as a penalty for an obscenity offense.

Third, the Government's proffered interpretation of the proportionality clause of Section 1467(a)(3) renders it redundant of well established Eighth Amendment law, and therefore meaningless. The Eighth Amendment prohibition against cruel and unusual punishments does not apply only when a statute so provides. In *Solem v. Helm*, the Supreme Court held "as a matter of principle that a criminal sentence must be proportionate to the crime for which the defendant has been convicted." *Solem v. Helm*, 463 U.S. 277, 290, 103 S.Ct.

---

**9.** The Court notes that Section 1467(a)(3) makes forfeitable "any property ... used *or intended to be used* to commit or to promote the commission" of the obscenity offense, but that the court is to "tak[e] into consideration the nature, scope, and proportionality of *the use of the property in the offense.*" Under a plain reading

of this language, it appears that property which the trier of fact finds was only intended to be used by a defendant, but was not actually used in the offense, should be excluded from forfeiture under the "nature, scope, and proportionality" clause.

3001, 3009, 77 L.Ed.2d 637 (1983). If Section 1467(a)(3)'s proportionality clause has any meaning at all, it must mean more than that the Court may consider constitutional factors that it has a preexisting duty to consider in sentencing the Defendants.

Fourth, the Government's interpretation of the Eighth Amendment's prohibition on cruel and unusual punishments conflicts with controlling case law. The Government's position is drawn from Justice Scalia's opinion in *Harmelin v. Michigan*, —— U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (plurality opinion) (Scalia, J.). In *Harmelin* the Supreme Court held that a Michigan law mandating life imprisonment for drug possession did not violate the Eighth Amendment. Despite his lengthy historical analysis of the Eighth Amendment, however, Justice Scalia was able to convince only Chief Justice Rehnquist that proportionality review applies only to death penalty cases, *see id.* at ——, 111 S.Ct. at 2701, and that "*Solem* was simply wrong; the Eighth Amendment contains no proportionality guarantee." *Id.* at ——, 111 S.Ct. at 2686. In contrast, Justices Kennedy, O'Connor, and Souter found that "[o]ur decisions recognize that the Cruel and Unusual Punishments Clause encompasses a narrow proportionality principle" that applies to both capital and noncapital cases. *Id.* at ——, 111 S.Ct. at 2702 (Kennedy, J., concurring). Justices White, Blackmun, Stevens, and Marshall recognized a broader proportionality guarantee in the Eighth Amendment, and stated that "[t]o be constitutionally proportionate, punishment must be tailored to a defendant's personal responsibility and moral guilt." *Id.* at ——, 111 S.Ct. at 2716 (White, J., dissenting); *see id.* at ——, 111 S.Ct. at 2719 (Marshall, J., dissenting). In short, the Eighth Amendment still embodies a guarantee that criminal punishment shall not be disproportionately severe; as the *Solem* Court stated, "no penalty is *per se* constitutional." *Solem v. Helm*, 463 U.S. at 290, 103 S.Ct. at 3009.[10]

The Court first considers the Government's requested forfeitures of properties belonging to CPLC, Video Team, and Browning, as those Defendants were most directly responsible for the Section 1462 offenses. CPLC and Video Team both are legal businesses; the Government did not charge them with RICO violations, even though obscenity offenses are proper predicate offenses under the Racketeer Influenced and Corrupt Organizations Act. *See* 18 U.S.C. § 1961(1)(B) (defining "racketeering activity" as any act which is indictable under 18 U.S.C. §§ 1461–1465); *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 65, 109 S.Ct. 916, 928, 103 L.Ed.2d 34 (1989) (stating that "adding obscenity-law violations to the list of [state] RICO predicate offenses was not a mere ruse to sidestep

---

**10.** The Government contends that "[s]everal circuits, the Fifth included, either do not recognize an Eighth Amendment proportionality review or doubt that it is required whenever the sentence is less than life without possibility of parole." Motion for Forfeiture at 11. The Government's contention is incorrect. First, the United States Supreme Court has declared a ninety-day sentence for the crime of being addicted to narcotics unconstitutionally severe under the Eighth Amendment. *See Robinson v. California*, 370 U.S. 660, 667, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962) ("Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold.").

Second, in the Fifth Circuit case relied on by the Government, *Moreno v. Estelle*, 717 F.2d 171 (5th Cir.1983), the court did not question whether the Eighth Amendment applied to sentences less than life without parole. Rather, the Fifth Circuit found that where the district court held an evidentiary hearing on the defendant's Eighth Amendment challenge to his sentence of life (with eligibility for parole), there was no requirement of "extensive analysis" by the circuit court of the proportionality criteria set forth in *Solem v. Helm*. "'[I]t is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence; rather, in applying the Eighth Amendment the appellate court decides only whether the sentence under review is within constitutional limits.'" *Id.* at 180 n. 10, *quoting Solem v. Helm*, 463 U.S. 277, 290 n. 16, 103 S.Ct. at 3009 n. 16 (1983).

Finally, it is clear beyond peradventure that the Eighth Amendment proportionality guarantee applies to Section 1467 forfeiture, for it is *in personam:* a punishment imposed on a guilty defendant. In this regard, the Government is unable to identify, and the Court is aware of, no case in which a violation of the federal obscenity laws has resulted in the forfeiture of an entire business—no less three businesses—under Section 1467.

the First Amendment"). CPLC has been in business since 1973; Video Team was created in the mid–1980s. At the time the Defendants were indicted, CPLC and Video Team distributed sexually explicit video tapes to over 400 subdistributors in Texas, over 50 of whom are located in the Dallas–Fort Worth area. CPLC and Video Team have shipped sexually explicit video tapes to this area of Texas since 1978.

As already noted, only two of the eight indicted video tapes were found by the jury to be obscene. The orders for the obscene video tapes were received and processed, and the video tapes were packaged for shipment, at CPLC's and Video Team's place of business in Los Angeles. The two obscene video tapes represent just two titles out of Video Team's inventory of some 5,700 video tape titles. Video Team received $9.90 in gross proceeds from the sale of the two obscene video tapes to Good Vibrations in Dallas. Although the Government contends that 50% of the magazines carried by CPLC and 95% of the video tapes carried by Video Team are "hard core," the Court declines the Government's invitation to *sua sponte* declare all of this material obscene. Video Team sold about $400,000 worth of sexually explicit video tapes to buyers in Texas between 1986 and 1990. The present inventory of CPLC and Video Team is valued at approximately $1.25 million. The CPLC building itself, which houses both CPLC and Video Team, is worth $346,000. CPLC and Video Team officers and employees are paid from the corporate bank accounts found to be subject to forfeiture, and shipping charges were paid to UPS from those accounts. Thousands of dollars flow through each of those bank accounts monthly.

The Government contends that because the real property housing CPLC and Video Team was used in the commission of the Section 1462 offenses and because the corporate bank accounts either were used in the commission of the offenses or were used to facilitate the commission of the offenses, all of CPLC's and Video Team's property is subject to forfeiture. The Court does not agree. First of all, the properties at issue here are entirely legal; there is no allegation of that any sort of contraband is among the properties the Government seeks to have forfeited.[11] The properties subject to forfeiture were used in the ordinary course of business by legitimate mail-order enterprises, and had been so used for nearly twenty years. Furthermore, the Defendants' use of the property for the commission of the Section 1462 offenses was minuscule in relation to their total use of the properties. Finally, the Government seeks a blanket forfeiture of all of the Defendants' property, even though Section 1467(a)(3) was intended to provide for forfeiture only of "things used to produce or transport the obscene article." President's Message at 82.

The Government contends that because a magistrate found probable cause to believe that all eighty video tapes shipped to Dallas by the Defendants were obscene, they should be deemed to be obscene for the purpose of Section 1467. The Court does not agree. The Government saw fit to indict the Defendants on eight video tapes. Presumably, the Government chose the eight video tapes it felt most clearly violated the Dallas community's standards of decency; the jury found only two of the eight video tapes to be obscene. In any event, the Government did not offer the seventy-two unindicted video tapes in evidence. To assume that the unindicted video tapes are obscene would be as improper as finding that all eight of the indicted video tapes are obscene, despite the fact that the jury did not so find.[12] The

---

**11.** The Government contends that some of the sexual devices sold by CPLC that are subject to forfeiture are obscene devices as defined by the Texas Penal Code. The Government presented no evidence that any of the devices has been adjudicated as obscene by a Texas court. Furthermore, all of the devices subject to forfeiture are in California, so how they may be classified by the Texas Penal Code is irrelevant, as the

Court's analysis of Section 1467(a)(1) makes clear.

**12.** Similarly, the Government argues that because "there is evidence showing that [CPLC and Video Team] carried 371 titles that have been found to be obscene in the state of Texas," Motion for Forfeiture at 17, the Court should deem these films obscene for the purposes of

Government's attempt to transform a jury's finding that two video tapes are obscene into a judicial determination that the Defendants operate an obscenity "empire," *see* Motion for Forfeiture at 7, constitutes impermissible bootstrapping.

In short, the nature, scope, and proportionality of the use of the properties in the Section 1462 offenses simply does not support a finding of forfeiture under Section 1467. Forfeiture under these circumstances of truly *de minimis* use of the properties for the commission of the offenses simply serves no legitimate end; that is, no end other than destroying legal business enterprises simply because their stock in trade is sexually related materials. Forfeiture is inappropriate in this case, particularly when Browning faces a prison term and both he and the corporate Defendants face substantial fines for their offenses.

The case for forfeiture of assets belonging to Great Western and Warner is even weaker than that concerning CPLC, Video Team, and Browning. Great Western is a legitimate printing company that has been in business for decades. The Government did not allege that anything printed or produced by Great Western was obscene, and there was no proof that Great Western or Warner shipped any of the video tapes named in the indictment. Likewise, there was no proof that Great Western or Warner was actively involved in the operations of CPLC or Video Team. The Government gained Section 1462 convictions against Great Western and Warner on the basis of evidence showing that Great Western printed the box covers for the video tapes that were shipped to Dallas.

Great Western printed the box covers for only one of the four video tapes charged in

Counts Two and Four of the indictment after Section 1467 became effective in November, 1988.[13] Because Section 1467(a)(3) was intended to provide for forfeiture only of things used to produce or transport the obscene article, it is likely that subsection (a)(3) does not apply to Great Western because Great Western had nothing to do with the production or transportation of the obscene video tapes. If Section 1467 does apply to Great Western and Warner, the Court finds that their use of the property found to be subject to forfeiture was insignificant in the commission of the Section 1462 offenses and that the relationship between the properties sought by the Government and the offenses is far too remote and tenuous to warrant forfeiture under Section 1467.

Great Western printed 3,210 box covers for one of the charged video tapes and received $1,926 for the entire printing job; it received 60 cents for printing the box cover that was shipped to Good Vibrations in Dallas. Although Great Western regularly printed materials for Video Team, the box covers for the charged video tape were printed for a different customer, which inserted a copy of the obscene video tape and then sold it to Video Team. Great Western does approximately 500 printing jobs per month for approximately 250 different customers, of which Video Team is one. Between 1986 (when Great Western first printed box covers for video tapes charged in Counts Two and Four of the indictment) and March, 1990 (when the Government executed its search warrant for Great Western's premises) Great Western printed almost 50 million video box covers. Great Western prints many other items, including magazines, brochures, and advertising ma-

Section 1467. The Court declines to do so. The Court finds that the evidence proffered by the Government is irrelevant, and therefore not admissible; the Government admitted that it had absolutely no evidence that the Defendants ever shipped a single copy of any of the 371 titles into the Dallas Division of the Northern District of Texas. Accordingly, there is simply no nexus between those 371 video tapes and the Defendants' Section 1462 offenses. *See* Fed.R.Evid. 401, 402. (Actually, the proper number of guilty verdicts is 369: 359 by guilty pleas, and

10 by jury verdicts. Two of the 371 cases resulted in acquittals.)

**13.** The Government contends that Great Western manufactured the box covers of at least eighty obscene video tapes. *See* Motion for Forfeiture at 16. As stated above, the Court declines to find that all eighty video tapes shipped to Dallas by the Defendants are obscene.

terials. Approximately 60% of the material produced by Great Western is sexually explicit, and some of it is hard-core sexual material; nonetheless, the Government did not charge Great Western with printing anything obscene. Michael Warner's salary is paid out of the bank account found to be subject to forfeiture.

On the basis of these facts, the Government seeks the forfeiture of Great Western's bank account, its place of business, and the contents of its printing plant— contents which the Government values at about $7.5 million. The Court finds no reason to order a forfeiture. First of all, the properties at issue here are entirely legal; there is no allegation of that any sort of contraband is among the items the Government seeks to have forfeited. The properties subject to forfeiture were legally used in the ordinary course of business by a legitimate printing company that has been in business for decades. Nothing printed or manufactured by Great Western was alleged to be obscene or otherwise illegal. Furthermore, the connection between Great Western's and Warner's use of the property and the commission of the Section 1462 offenses is tenuous and remote; the box cover containing the video tape the Court assumes to have been found obscene was not even sold to Video Team, so Great Western could have had no idea that Video Team was going to ship it across state lines. The use of the properties for printing the video tape box cover that was shipped to Dallas was minuscule in relation to the Defendants' total use of the properties. Finally, as already stated, subsection (a)(3) was only intended to "cover the things used to produce or transport the obscene article."

In short, the nature, scope, and proportionality of the use of the properties in the Section 1462 offense simply does not support a finding of forfeiture under Section 1467. The Court finds that forfeiture of property belonging to Great Western and

Michael Warner is entirely inappropriate, particularly when Warner faces a prison term and both he and the Great Western face substantial fines for their offenses.[14]

### D. RICO Forfeiture Statute is not Applicable.

■ The Government's case for forfeiture rests on the argument that because a majority of Great Western's, and all of CPLC's and Video Team's, business involves sexually related materials, expressive and otherwise, all of the Defendants' property was "used or intended to be used to commit or to promote the commission" of the Section 1462 offenses for the purposes of Section 1467. In other words, the Government argues that CPLC, Video Team, and Great Western are illegal enterprises because their Section 1462 convictions arose from the conduct of their businesses. Therefore, the Government argues, because there is "some connection between the obscenity and the business to be forfeited," Motion for Forfeiture at 18, the business ought be ordered forfeit. Neither the record nor the forfeiture statute supports such a conclusion.

First, as already noted, subsection (a)(3) was intended by President Reagan, who proposed Section 1467 on the advice of the Attorney General's Commission on Pornography, only to "cover the things used to produce or transport the obscene article." The scope of the Government's proposed forfeiture is far in excess of that intended by the legislation.

Second, the Government did not charge the Defendants under the federal RICO statute, 18 U.S.C. § 1961 *et seq.*, despite the fact that acts indictable under Sections 1461 and 1462 constitute predicate offenses under the RICO statute. *See* 18 U.S.C. § 1961(1)(B). The Government cannot avail itself of the benefits of the RICO forfeiture statute when it chooses not to prosecute under the RICO Act.

---

**14.** Although the language of Section 1467 requiring the Court to perform a proportionality analysis before ordering forfeiture under Section 1467(a)(3) makes a separate Eighth Amendment proportionality inquiry unnecessary, the

facts of the present case suggest that the forfeiture sought by the Government is unconstitutionally excessive, particularly as to Great Western.

Third, even if the Government had charged the Defendants under RICO, "eighth amendment concerns may arise when a defendant must forfeit his or her entire interest in an otherwise legitimate business, even though only a few minor acts in the course of conducting the business were the predicate acts sufficient for a RICO violation," *United States v. Feldman,* 853 F.2d 648, 663 (9th Cir.1988), *cert. denied,* 489 U.S. 1030, 109 S.Ct. 1164, 103 L.Ed.2d 222 (1989), because forfeiture under RICO is punishment subject to the limits imposed by the Eighth Amendment. *See United States v. Horak,* 833 F.2d 1235, 1251 (7th Cir.1987) ("We are not insensitive to the concern that vast prosecutorial discretion in combination with potentially enormous forfeiture orders might in some circumstances threaten Eighth Amendment rights."); *United States v. Littlefield,* 821 F.2d 1365, 1368 (9th Cir.1987) (stating that "criminal forfeiture is a form of punishment and therefore subject to the eighth amendment's prohibition against disproportionate punishments"); *United States v. Busher,* 817 F.2d 1409, 1413–14 (9th Cir. 1987) (quoting *Solem v. Helm,* 463 U.S. 277, 284, 103 S.Ct. 3001, 3006, 77 L.Ed.2d 637 (1983) in finding that RICO criminal forfeiture statute is a form of punishment governed by the Eighth Amendment). Had this case been prosecuted under RICO, the Eighth Amendment concerns raised by the *Feldman* court would warrant strict scrutiny of the Government's requested forfeiture.

Fourth, reliance on RICO or case law under that statute is misguided when analyzing Section 1467 for the simple reason that the RICO forfeiture statute, 18 U.S.C. § 1963, and Section 1467, although both providing for criminal forfeiture, are not at all the same.[15]

> Section 1963 is purposely broad.... [It] was designed to totally separate a racketeer from the enterprise he operates. Thus, forfeiture is not limited to those assets of a RICO enterprise that are tainted by use in connection with racketeering activity, but rather extends to the convicted person's entire interest in the enterprise.
>
> Moreover, the substantive provisions of RICO, to which Section 1963 is keyed, cover an extraordinarily broad range of activities. Forfeiture under RICO can thus result from very serious, as well as from more trivial, violations of the law.

*United States v. Busher,* 817 F.2d at 1412–3 (footnotes and citations omitted); *see United States v. Cauble,* 706 F.2d 1322, 1349 (5th Cir.1983) (discussing mandatory nature of forfeiture under Section 1963), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). Under Section 1963, once the jury determines that property was acquired, maintained, or operated in violation of Section 1962, it must find forfeit the defendant's entire interest in that property. Furthermore, the statute does not provide the district judge with authority to exclude any property from the forfeiture, nor does it provide for a proportionality analysis. These characteristics have prompted serious concern about the constitutional limits to the application of the RICO forfeiture statute. *See United States v. Busher,* 817 F.2d at 1414 ("Since RICO's forfeiture pro-

---

**15.** Furthermore, Section 1467 was patterned after the drug forfeiture statute, 21 U.S.C. § 853, and not RICO. *See* President's Message at 81, 82; Section Analysis of Judiciary Committee Issues in H.R. 5210, 134 Cong.Rec. S17375 (daily ed. Nov. 10, 1988) (statement of Sen. Biden). Although there are similarities between Section 1467 and Section 853, the statutes hardly are analogous. Most significantly, by specifying that property is subject to forfeiture if used in "any manner or part" to commit or facilitate a drug offense, Section 853 provides for complete forfeiture even where only a portion of the property was used for a prohibited purpose. *See United States v. Harris,* 903 F.2d 770, 777 (10th Cir.1990) (adopting ruling of *United States*

*v. Littlefield,* 821 F.2d 1365, 1367 (9th Cir.1987)). The lack of a clause requiring consideration of the nature, scope, and proportionality of the use of the forfeitable property in the commission of the offense does not, of course, exempt Section 853 from such an analysis under the Eighth Amendment. *See United States v. Robinson,* 721 F.Supp. 1541, 1543–45 (D.R.I.1989) (finding requested penalty of forfeiture of lease and federal housing assistance disproportionately severe under the Eighth Amendment); *cf. United States v. One Gates Learjet Serial No. 28004,* 861 F.2d 868, 870–73 (5th Cir.1988) (reversing order forfeiting aircraft where only evidence that aircraft had been used to transport drugs were insignificantly small traces of cocaine).

vision is quite literally without limitation, it may well exceed constitutional bounds in any particular case.")

In contrast, the obscenity forfeiture statute is relatively narrow. Unlike Section 1963, Section 1467 only applies to defendants found guilty of a federal obscenity offense.[16] Section 1467 only provides for mandatory forfeiture of the materials found to be obscene and the proceeds derived from the sale of those materials. The district court is given discretion to exclude any part, or all, of a defendant's property found to be subject to forfeiture under subsection (a)(3). Rather than applying to property that was acquired, maintained, or operated in violation of the law, like Section 1963, property forfeitable under Section 1467(a)(3) must be found to have been used or intended to be used in the commission of the underlying obscenity offense, or to promote the commission of that offense. Furthermore, the obscenity forfeiture statute allows exclusion from a forfeiture order of property that is "untainted" by the obscenity offense because the district court is directed to "tak[e] into consideration the nature, scope, and proportionality of the use of the property in the offense." 18 U.S.C. § 1467(a)(3). Contrary to the Government's position that the Court may exercise its discretion to order a forfeiture of less than the complete amount sought by the Government only if the Government's proposed forfeiture would shock the conscience, subsection (a)(3) instructs the Court to perform a proportionality analysis before exercising its discretion under Section 1467.

In sum, whereas Section 1963 is broad and inflexible, *see United States v. Busher*, 817 F.2d at 1414, Section 1467 is considerably narrower and may be adapted by the district court to the facts of the particular case. The differences between the two statutes are too substantial for the Court to rely on analogies to RICO in its interpretation and application of Section 1467. More importantly, the Court declines to rely on the Government's RICO analogies because such analogies are unnecessary in light of the clear language of Section 1467. That statute authorizes the Court to exercise its discretion in ordering that property be ordered forfeit, and to do so taking into consideration the nature, scope, and proportionality of the use of the property in the offense. The Court has followed Section 1467 in reaching its decision.

### E. First Amendment.

 Finally, the Court briefly addresses the First Amendment concerns the Defendants have raised. By Order entered February 14, 1991 the Court refused Defendants' motion to dismiss Count Eight of the indictment on the ground that the forfeiture provisions of Section 1467 violate the First Amendment. The Court here affirms its ruling that Section 1467 is not unconstitutional on its face. Whether the statute is unconstitutionally applied in a given case will, of course, depend on the facts of the case.

In the present case, the situation of Great Western raises the most significant First Amendment concerns.[17] As already explained, because Great Western manufactured a 60–cent video tape box cover the Government seeks the forfeiture of Great Western's printing facility.

Under such circumstances, the Court cannot uncritically accept the Fourth Circuit's easy assurance that "[t]he forfeiture provided by 18 U.S.C. § 1467 does not violate the First Amendment even though certain materials, books and magazines, that are forfeited, may not be obscene and, in other circumstances, would have constitutional protection as free expression."

---

**16.** The federal RICO statute includes as predicate offenses numerous state-law felonies, an expansive list of federal criminal offenses, and numerous acts indictable under Titles 29 and 11 and the Currency and Foreign Transactions Reporting Act.

**17.** The situation of CPLC and Video Team is similar to that of Great Western because they too were threatened with total forfeiture of their assets for transporting $9.90 worth of obscene video tapes across state lines. Great Western's position is different, however, because Great Western did not actually handle, ship, or otherwise process the order for the video tapes found to be obscene.

*United States v. Pryba,* 900 F.2d 748, 755 (4th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990). To begin with, *Pryba* concerned forfeiture under RICO's forfeiture provision and not Section 1467. *See id.* at 752 ("Following the jury verdicts finding violations of 18 U.S.C. § 1962(a), (c), and (d), the same jury heard an additional week of testimony on the issue of forfeiture under 18 U.S.C. § 1963(a)(1)."). Even more to the point, although the *Pryba* court declared Section 1467 constitutionally sound, its analysis clearly concerns RICO's Section 1963, not Section 1467.

> There was a nexus established between defendants' ill gotten gains from their *racketeering activities* and the protected materials that were forfeited. The forfeiture did not occur until after defendants were convicted of violating various obscenity statutes and of *participating in a racketeering activity,* and until after it was established beyond a reasonable doubt that the proceeds from these criminal activities had been used to acquire the arguably protected publications.

*Id.* at 755 (emphasis added).

Furthermore, although the Fourth Circuit properly criticized "reasoning [that] would allow the Colombian drug lords to protect their enormous profits by purchasing the New York Times or the Columbia Broadcasting System," *id.,* it did not consider the equally important possibility that under its reasoning the New York *Times* could be forced to forfeit its publishing facilities if they were used to manufacture a nonobscene video tape box cover.

Under the facts of this case, the Court cannot accept the Fourth Circuit's assertion that forfeiture of materials presumptively protected by the First Amendment is constitutionally permissible so long as a forfeiture statute's procedures are followed. *See id.* at 756. The First Amendment's safeguards against prior restraint of expression do not vanish merely because a criminal statute is used to silence printing presses. As far back as the decision in *Near v. Minnesota* the Supreme Court rec-

ognized that the way in which a restraint on speech is "characterized" is of little consequence. *See Near v. Minnesota,* 283 U.S. at 720–21, 51 S.Ct. at 632–33 ("Characterizing the publication as a business, and the business as a nuisance, does not permit an invasion of the constitutional immunity against restraint."); *see also Fort Wayne Books, Inc. v. Indiana,* 489 U.S. at 66, 109 S.Ct. at 929 (finding no meaningful distinction between seizure made under state RICO law and state obscenity statute); *Schad v. Mount Ephraim,* 452 U.S. 61, 67–68, 101 S.Ct. 2176, 2181–82, 68 L.Ed.2d 671 (1981) (holding that where zoning ordinance operated to exclude a broad category of protected expression, "the standard of review is determined by the nature of the right assertedly threatened or violated rather than by the power being exercised or the specific limitation imposed"); *Vance v. Universal Amusement Co.,* 445 U.S. 308, 317, 100 S.Ct. 1156, 1162, 63 L.Ed.2d 413 (1980) (affirming Fifth Circuit's ruling striking down as an impermissible prior restraint a Texas public nuisance statute that authorized closing theaters for exhibiting obscene films); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 552–55, 95 S.Ct. 1239, 1243–45, 43 L.Ed.2d 448 (1975) (finding an unlawful prior restraint of expression where public officials had unbridled discretion over theater's use). Indeed, *Near* concerned a statute by which "Minnesota empowered its courts to enjoin the dissemination of future issues of a publication because its past issues had been found offensive. In the language of Chief Justice Hughes, 'This is of the essence of censorship.' As such, it was found unconstitutional." *Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 445, 77 S.Ct. 1325, 1330, 1 L.Ed.2d 1469 (1957) (citation omitted). The theory of forfeiture advanced by the Government here raises the same concerns of censorship that the Minnesota statute elicited from Chief Justice Hughes.

In *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 707, 106 S.Ct. 3172, 3177, 92 L.Ed.2d 568 (1986) (plurality opinion), the Supreme Court ruled that the First Amendment did

not bar enforcement of a New York statute that was used to close a bookstore because it was used for the solicitation of prostitution, finding that bookselling does not confer First Amendment protections on an establishment used for prostitution. Justice O'Connor, however, stated that were a statute used "as a pretext for closing down a bookstore because it sold indecent books or because of the perceived secondary effects of having a purveyor of such books in the neighborhood, the case would clearly implicate First Amendment concerns and require analysis under the appropriate First Amendment standard of review." *Id.* at 708, 106 S.Ct. at 3178 (O'Connor, J., concurring).

The Court finds Justice O'Connor's observation well worth heeding. Where, as here, the Government seeks the forfeiture of a printing facility from a party that has not even been charged with publishing obscene material, First Amendment concerns cannot be avoided simply by observing that the Government has followed the statute's procedures, nor by noting that a post-conviction forfeiture cannot constitute prior restraint. In finding that Section 1467 is not facially unconstitutional, the District Court for the District of Columbia stated that "some post-conviction forfeitures of bookstores and other businesses that engage primarily in expressive activity could be so broad that they violate the First Amendment by removing from circulation considerable amounts of protected material. For now, such cases can be dealt with on a case-by-case basis." [18] *American Library Ass'n v. Thornburgh,* 713 F.Supp. 469, 486 (D.D.C.1989); *see id.* at 483–84 (stating that "[t]his Court could imagine that certain post-conviction forfeiture orders would clearly offend the First Amendment"). Indeed, the *American Library* court stated that the Supreme Court's "rul-

ing in *Arcara* clearly did *not* ... give a green light to seizure or forfeiture of any and all First Amendment protected material by any sort of business merely because the business was engaged in some criminal behavior." *Id.* at 483.

The Government's requested application of Section 1467 to Great Western is a transparent pretext for closing down a legitimate printing business because that business publishes sexually explicit materials. In addition to being unsupported by the language of Section 1467 and constituting a Draconian punishment, the Government's requested forfeiture of Great Western's printing facility is subject to close First Amendment analysis and likely would, if granted, constitute an impermissible prior restraint of expression under *Near v. Minnesota* and its progeny. These constitutional concerns reinforce the Court's finding that forfeiture of the Defendants' properties is not warranted.

### III. Conclusion.

For the reasons stated above, the Court, in the sound exercise of its discretion as provided under Title 18, United States Code, Section 1467(a)(3) and (e), finds that Defendants California Publishers Liquidating Corporation, Video Team, Inc., Investment Enterprises, Inc. (doing business as Great Western Litho & Bindery), Donald P. Browning, and Michael Warner shall not be compelled to forfeit any of the properties listed in Count Eight of the indictment. Accordingly, the Government's motion for order of forfeiture of the Defendants' properties is DENIED.

SO ORDERED.

---

**18.** The *American Library* court's finding that post-conviction forfeitures could be so broad as to violate the First Amendment was made in a case that did not involve questions of local morality or federalism as expressed by the *Miller v. California* obscenity test. *See American Library Ass'n v. Thornburgh,* 713 F.Supp. at 473 (stating that "the law at issue here is a national statute, with equal standards imposed from big cities to

rural counties"). In the present case, as already explained, the jury applied the community standards of the Dallas Division of the Northern District of Texas. Forfeiting presumptively protected materials located in California on the basis of the jury's obscenity finding raises precisely the threat of imposed national uniformity that the *Miller* test was designed to prevent.